672

*In the Matter of the Petition of* NORTHWEST GREYHOUND
LINES, INC.

NORTHWEST GREYHOUND LINES, INC. *et al., Appellants,* v.
R. D. McCORNACK *et al., Respondents.*[1]

[1]Reported in 251 P. (2d) 607.

*Macbride, Matthews & Hanify,* for appellants.

*Ogden & Ogden,* for respondents.

FINLEY, J.—The ultimate objective of this lawsuit is the consummation of a merger of Northwest Greyhound Lines, Inc., into the Greyhound Corporation. Appellants seek to accomplish the stated objective under the provisions of Rem. Supp. 1949, § 3803-41 (RCW 23.16.160), by forcing minority shareholders of Northwest Greyhound Lines, Inc. (apparently opposed to the merger), to sell their Northwest stock; and permitting its acquisition by The Greyhound Corporation at an appraised value, or price. Under the provisions of the above-mentioned statute, Northwest Greyhound Lines, Inc., petitioned the superior court of King county, asking that the stock of the dissenting minority shareholders be appraised, and that its value be fixed by the court.

The trial court appointed an appraiser. He conducted an investigation. A tentative report respecting the value of the stock was prepared for the trial court. The interested parties presented evidence and argued their contentions

relative to the value of the stock, first, at a hearing before the appraiser, and thereafter, at a limited hearing before the trial court on exceptions filed against the appraiser's report.

This appeal is from the judgment of the trial court confirming the appraiser's report and fixing the value of the stock at $80.59 per share. In addition to other errors assigned, appellants question the findings of the trial court, Nos. 6 to 12, inclusive. These findings are pointed out by number and description, in compliance with Rule on Appeal 43, 34A Wn. (2d) 47. Reduced to essentials, the contentions of appellants are:

1. That the scope of the superior court hearing should have been *de novo* as to the appraiser's report and his determination of stock value;

2. That review on appeal to the supreme court should be *de novo;*

3. That the record evidence does not sustain the valuation reported by the appraiser, and subsequently, fixed by the trial court, or a valuation exceeding approximately the sum of $35 per share;

4. That the formula or capitalization of average net earnings as used to determine the value of the stock (a) by the appraiser, and (b) accepted and approved by the trial court, "was wholly erroneous, arbitrary and capricious"; and that the appraiser "committed one error of 'huge dimensions,' and further errors, all of which would require correction by reversal of the judgment of the superior court."

5. That the trial court erred in charging the costs of the appraisal, including the fee and the expenses of the appraiser, against appellants.

Messrs. Fitzgerald and Whiting were the moving spirits in organizing and developing the Washington Motor Coach Company, Inc. The history of this organization appears to have been one of successful management and expanding corporate operations over a period of years prior to June, 1946, so much so, that The Greyhound Corporation became actively interested in acquiring the properties of the Wash-

ington Motor Coach Company, Inc., contemplating a merger of it into its own operations of national scope and magnitude. By June, 1946, The Greyhound Corporation had acquired approximately eighteen per cent of the stock of this object of its affections.

Messrs. Fitzgerald and Whiting owned 17,380-5/12 and 17,382-11/12 shares, respectively, of the common stock of Washington Motor Coach Company, Inc.,—or, approximately fifty-one per cent of the outstanding 67,644 shares of stock of that corporation. These two major stockholders had directed the operations of their bus lines for a number of years. They entered into an agreement with The Greyhound Corporation for the sale of their holdings at $30 per share, subject to approval by the interstate commerce commission. The agreement provided that other shareholders might participate in the sale. Furthermore, it provided that the parent corporation would purchase their stock at the same figure ($30 per share) as that tendered the two majority stockholders. Seventy-five stockholders sold their holdings at $30 per share in blocks of five to three thousand shares. R. D. McCornack (respondent in the instant case) participated in the transaction arranged between Messrs. Fitzgerald and Whiting and the parent corporation by selling 900 (approximately 55%) of the 1,630 shares owned by him. Mrs. Johanna Greig (respondent herein) sold 400 (66⅔%) of her 600 shares.

At this point, The Greyhound Corporation had acquired approximately 96.5% of the outstanding 67,644 shares of stock. Subsequently, the parent corporation acquired stock from other shareholders, thereby increasing its holdings to approximately 98.2% of the total outstanding stock. These latter-mentioned acquisitions were made on the dates and in blocks and at prices as follows:

| Date | Shares | Prices |
|---|---|---|
| 3/18/47 | 115 | $30.00 |
| 12/22/47 | 135 | 40.00 |
| 3/31/48 | 290 | 40.00 |
| 5/31/49 | 500 | 42.75 |
| 10/13/49 | 185 | 50.00 |
| 10/13/49 | 155 | 50.00 |

The Greyhound Corporation, after acquiring control of the majority of the stock of the Washington Motor Coach Company, Inc., changed the name of the latter to Northwest Greyhound Lines, Inc.

It is important to note that the last two stock purchases appearing in the above listing were made under a contract wherein it was agreed that the $50-per-share price would be increased by any amount over $50 per share which might result from the appraisal of the stock in the case here on appeal. It may be well to mention now that there is nothing in the record indicating that the Fitzgerald-Whiting sale at $30 per share was not an open-and-above-board deal; that is, the record does not intimate that some consideration or something of value in addition to the $30 per share was received by them.

In appellant's brief, it is pointed out that the parent corporation's proposal for merger contained an offer to exchange 3.2391 shares of The Greyhound Corporation common stock (totaling a then market value of approximately $36.04) for each share of stock of Northwest Greyhound Lines, Inc., if any shareholder thereof would be willing to make an exchange on the indicated basis. Appellants emphasize the fact that, in probate cause #45659, Spokane county, Washington, the estate of Mary Frances McCornack (deceased mother of R. D. McCornack, respondent herein), 270 shares of stock owned by the deceased were appraised as of July 17, 1948 (date of deceased's death), at $40 per share for inheritance tax purposes by the Washington state tax commission.

Essentially, § 3803-41, Rem. Supp. 1949, provides a procedure whereby corporate mergers or consolidations may be consummated although minority stockholders object thereto. Briefly, this result is accomplished through an appraisal or valuation of the dissenting stock by the superior court. The pertinent provisions of the statute provide that the superior court

". . . *shall appoint an Appraiser to determine such value.* Such Appraiser shall have power to examine any of the books and records of the corporation, the shares of which

he is charged with the duty of valuing, and he shall make a determination of the value of the shares upon such investigation as to him may seem proper. The Appraiser shall also afford a reasonable opportunity to the parties interested to submit to him pertinent evidence on the value of the shares. . . . The Appraiser shall determine the value of the shares of the shareholders adjudged by the Court to be entitled to payment therefor, and shall file his report, · respecting such value, in the office of the Clerk of said Court. . . . Such report shall be subject to exceptions to be heard before the Court both upon the law and facts. *After hearing exceptions* to the said report, *the Court shall, by its decree, determine the value of the shares* of the shareholders entitled to payment therefor . . ." p. 246. (Italics ours.)

Business expediency has dictated the policy contemplated by the statute. In *Voeller v. Neilston Warehouse Co.,* 311 U. S. 531, 535, 85 L. Ed. 322, 61 S. Ct. 376, the court comments upon a similar Ohio statute as follows:

"The objective of the Ohio statute permitting the right of appraisal to dissenting shareholders was the elimination of abuses that had long been a fixture in the field of corporate finance. . . . At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to cooperate. To meet the situation, legislatures authorized the making of changes by majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares, were widely adopted."

Ideally stated, the statute permits majority stockholders to proceed with merger plans regarded by them to be advantageous; on the other hand, it provides protection for dissenting stockholders. Though, in the end, they may be forced out of the particular corporation or business activity, an unconscionable financial loss is not their lot because their stock is purchased by the merger interests at a fair, equitable, or just figure. Theorizing is comparatively easy. Actual application of the statute to concrete situations gives rise to complex and confusing questions and, often times, the

results are possibly not comparable to those to be presumed under ideally stated conditions. Under the Washington statute, the superior court must "determine the value of the shares."

In attempting to articulate policy and to provide a workable procedure to effectuate it, our legislature employed the term "value." It is the crucial term in the statute. But no definition and no standards or guides for its interpretation and application to concrete situations are contained in the statute. We have not yet had occasion to interpret and apply the Washington statute. It is patterned after those enacted in several other states. It very closely resembles the Delaware statute. Decided cases with respect to comparable statutes of other jurisdictions are not legion. Actually, they are few in number.

Our problem is to determine what the word "value" connotes. Some statutes and some decided cases employ the phrase "fair value"; others refer to "intrinsic value"; still further terminology is used, such as "market value," "fair market value," "true value," "investment value," "nuisance value," "going concern value," "liquidation value," "earnings value," and "actual value." See II Bonbright, Valuation of Property 827, for a detailed discussion of *statutory* appraisals. There, we find a statement well worth quoting here, as follows:

" . . . As to the definition of the 'value' of the dissenters' stock, New York and other states are silent, and the usual meaningless or ambiguous language prevails elsewhere. . . ."

Beginning at p. 829 of the last above-mentioned treatise, we find the following significant comment:

"It is too early to tell whether the reasons advanced by the Massachusetts and the New York courts against the conclusiveness of current market prices will prevail in those states in which the statute itself refers to market value. We have found only one case bearing on the question, *Prall v. United States Leather Co.*, decided under the New Jersey 'full-market-value' statute, in which the appraisers were upheld for valuing the dissenter's preferred stock at its 'full market value' instead of at a value based on an appraisal of

the corporate assets. The court held that the appraisal should conform to principles that had already been deemed applicable to that rare phenomenon in American law, the condemnation by a government of shares in a corporation. The way in which 'full market value' was arrived at was not explained in the reported opinion, but the New Jersey statute provides expressly that this value must be ascertained 'without regard to any depreciation or appreciation thereof in consequence of the said merger or consolidation.' Of course, a statute so phrased is a self-contradiction in terms. An appraiser simply cannot find what the market value really was, while disregarding forces actually operative on the market price."

In this connection, see also 95 A. L. R. 922; 174 A. L. R. 960.

When formulating a policy regarding the conflicting interests of majority and minority stockholders, and in trying to find a procedure to implement policy and to provide a solution of the problem, the concepts of appraisal, valuation, compromise, and arbitration, were perhaps available to the legislators. The terms "appraisement" and "valuation" carry with them or connote something in the nature of a mathematical exactness or certitude. The term "compromise" and the term "arbitration" suggest more flexibility and imply estimation and approximation. Perhaps, as a practical matter, the latter terms or concepts more aptly apply to or describe the policy inherent in § 3803-41, Rem. Supp. 1949. The latter-mentioned terminology or concepts would not have presented the almost imponderable problem posed by the use of the term "value." An effort to define value by looking to the meaning of "market value" or "intrinsic value" is not too helpful. Neither of the latter terms is self-defining. They both require consideration of all the facts and circumstances relevant to a particular case or situation. For example, market value may provide an adequate measure, if a particular stock has been the subject of sufficient market sales; and further, if such sales can be said to be normal sales, involving a "willing seller and a willing buyer." However, with the use of this last phrase, further definition becomes necessary. What constitutes a willing seller? What is a willing buyer? Were the market sales

in any way manipulated with an increased or decreased price resulting to suit the purposes of the manipulator of the particular sales?

Generally speaking, we believe that the word "value" contemplates a consideration of all the facts and circumstances pertinent to a particular case in an effort to arrive at a fair and reasonable compromise or arbitration which may in some degree be lacking in mathematical exactness or certitude.

Confronted by the statute and with the problem of determining value, the appraiser appointed by the court conducted an investigation, as mentioned hereinbefore. He then held hearings, at which the basic issue was his tentative valuation of the stock herein involved. Appellants claim that, during the hearings, it became apparent the appraiser had relied upon an automatic formula to determine the value of the shares. Respondents object strenuously to this description of the method used by the appraiser. It is urged by them that the method be described as a capitalization of average net earnings to determine the value of the intangible assets of the Northwest Greyhound Lines, Inc. We understand the difference in nomenclature. Solely for convenience, we will use the phrase "appraiser's formula" hereinafter.

We shall now describe and analyze the formula used by the appraiser. Based upon the books and records of the corporation as of August 31, 1949, the sum of $620,055 (the value of the net intangible assets per book) was subtracted from the net corporate worth, per book, in the sum of $3,548,715. The result, in the sum of $2,928,660, was determined as the tentative value of the net *tangible* corporate assets.

After a personal investigation of the real-estate holdings and certain personal property, including a number of motor busses, the appraiser concluded that the value of the tangible assets should be adjusted by an estimated increase in value in the sum of $368,042. In other words, it was the appraiser's judgment that the net tangible assets per book were undervalued at roughly ten per cent. Making the appraiser's

adjustment of $368,042, produced the sum of $3,296,702, as the value of the net tangible assets.

For the purpose of determining the average annual earnings, the appraiser selected the years 1943 to 1948, inclusive, and from the actual earnings, per corporate records, produced the figure of $436,107, as the estimated future annual earnings. The appraiser next selected *eight per cent,* as a proper rate of return to be attributable to the net tangible asset value of $3,296,702. An *eight per cent* return on that figure produced the sum of $263,736. Taking this sum as the portion of the estimated future annual earnings to be assigned as the return on the net tangible assets, and subtracting this sum from $436,107 (estimated future annual earnings), results in the sum of $172,371, as the remainder of the estimated annual earnings assignable as the return on the *net intangibles.* Adopting *eight per cent* as a proper return relative to the intangibles, the assumption was made that the above figure of $172,371 represented 8% of the total value of the net intangible assets. Since *eight* times 12½ equals 100%, the multiplication of $172,371 by 12½, theoretically, would give a total estimated value for the net intangible assets, or the sum of $2,154,637. The appraiser added to the latter figure his adjusted value of the net tangible assets in the sum of $3,296,702, producing the sum of $5,451,339, as the total estimated or appraised value of the corporate assets. Division of the latter sum by the total number of outstanding shares of stock (67,644 shares), produced the sum of $80.59, as the appraiser's estimated value of each share of stock of Northwest Greyhound Lines, Inc., as of August 31, 1949.

A condensed accounting version of the essence of the immediately foregoing three paragraphs is set forth as follows:

| | |
|---|---:|
| Total assets per books.............................. | $5,395,354 |
| Less total liabilities (including "equipment obligations" of $886,250)........................... | 1,846,639 |
| Net worth per books...................... | 3,548,715 |
| Less intangible assets per books................... | 620,055 |
| | $2,928,660 |
| Add adjustments on appraisal of tangible property.. | 368,042 |
| Net tangible asset value per appraiser...... | 3,296,702 |
| Appraiser's estimated future annual earnings........... | 436,107 |
| Less 8% return on net tangible asset value ($3,296,702) ............................... | 263,736 |
| Remainder attributable to "intangibles"........... | 172,371 |
| "Intangibles" value ($172,371 capitalized at 8%)........ | 2,154,637 |
| Add net tangible asset value..................... | 3,296,702 |
| "Total value" ........................... | $5,451,339 |
| Per share (67,644 shares)........................ | $      80.59 |

Respondents contend that the formula used by the appraiser, or the capitalization of average annual net earnings to determine the value of intangible net assets, is an acceptable, accurate method to evaluate stock of a closely held corporation, particularly where, as they claim, evidence of representative market or other sales may be scant or lacking altogether. It is suggested that the formula has received judicial approval in tax and bankruptcy cases, in valuations of stock by the securities and exchange commission in dissolutions under the Federal public utility holding company act. *Securities & Exchange Commission v. Central-Illinois Securities Corp.,* 338 U. S. 96, 93 L. Ed. 1836, 1871, 69 S. Ct. 1377; *Consolidated Rock Products Co. v. Du Bois,* 312 U. S. 510, 85 L. Ed. 982, 993, 61 S. Ct. 675; *Public Service Commission of New York v. Securities & Exchange Commission,* 166 F. (2d) 784, 788; *Niagara Hudson Power Corp. v. Leventritt,* 340 U. S. 336, 95 L. Ed. 319, 326, 71 S. Ct. 341.

Apparently the trial court accepted respondents' arguments, and relied essentially on the appraiser's formula in the entry of the judgment fixing the value of the stock of Northwest Greyhound Lines, Inc. Appellants made a motion in the trial court for a continuance, seeking an oppor-

tunity to present additional evidence against the appraiser's report and his valuation of the stock. We think the trial court may have erred in denying this motion.

■ Under the statute, the trial court is not strictly limited to a review of the evidence presented at the hearing before the appraiser. It may be difficult to imagine what additional evidence could have been offered by appellants in view of the extensive record made at the appraiser's hearing; nevertheless, we believe the court might well have permitted an offer of proof by appellants. If convinced that the evidence was merely cumulative, the offer of proof could have been ruled on adversely. If the evidence was not merely cumulative but was material and relevant to the issue of value, it should have been presented in the trial court; or, as an alternative, the appraisal could have been reopened for the presentation of the evidence at a future hearing before the appraiser.

■ It was urged upon the trial judge that he was bound by the appraiser's determination of value and as to the matters of judgment passed upon by the appraiser. We do not agree. The statute contemplates that a qualified appraiser will be appointed by the superior court. This is for the assistance of the court. The appraiser's function and the scope of his authority are purely advisory. The function of determining stock valuation, and the responsibility therefor, is vested in the superior court and not in the appraiser. The memorandum decision of the trial court (May 28, 1951) states:

"Well, gentlemen, I do not know exactly what the right approach to this problem is. Certainly the report of the appraisor is entitled to some respect when it comes in here. He is the man who physically examined the properties. He is the man who heard testimony. I think you said he had eight days of hearings before himself, in addition to the days when he appeared here in court. And certainly he is a man with a world of experience in just this sort of thing.

"I do not know anyone in my acquaintance whom I would regard as better qualified to do a job like this than Mr. Hibbard. But as a legal proposition, what status does his

report have when it comes in? There must be some presumption in its favor.

"Now, Mr. Ogden has taken the position that he must be sustained unless some error of fact or law can be discovered in the method that he used. In effect, that is saying that I must accept his report unless it is so patently erroneous that the minds of reasonable men could not differ on the subject. I am not so sure that the statute contemplates quite such an extreme, and so I have been looking at it from a standpoint of one reviewing the facts and making an independent determination of the questions.

"I have from time to time over the past year read the briefs that have been submitted. I have read the cases cited in the briefs. I have read most of the exhibits submitted to the appraisor. And it may be that if I had been appointed the appraisor, I might have used a little different approach and reached a vastly different result. But I can not find any flaw in the formula that Mr. Hibbard used.

"Certainly he is far better qualified than I am to conduct such an investigation or study and come up with an opinion. I can read the cases and apply the law to what he does, but on the areas that fall strictly within the realm of business experience, in accounting practice, the appraisor is far better qualified to judge than I am, or better qualified than most lawyers or most judges would be.

"Now, I simply can not find anything which I would regard as obviously erroneous, in the method that he adopted. It may be that if we had two other appraisors working with him as a board or committee of appraisors, the other two might have come up with a somewhat different result, but he exercised his own best judgment concerning the values which went into making up the factor or making up the formula and the rates or factors to be used in computing it, and frankly, throughout these arguments I have not been convinced that there is anything erroneous about the figures that he used or the formula that he used.

"I think in the circumstances the only thing for me to do is to approve the report of the appraisor without any change or modification whatever. And let the matter go up on appeal if it comes to that."

The statement of facts shows that the trial court commented further, as follows:

"I must not leave the record in such shape that it says I adopt the report. The record must indicate that I went

through the mental process myself and understood what the appraiser did."

■ Apropos of our views expressed in the several preceding paragraphs, it is our belief that, within reasonable limitations, the hearing of the exceptions to the appraiser's report and the trial of the issue of the valuation of the stock is essentially *de novo* in the superior court. We think that review in the supreme court must be within the limits prescribed by Rule on Appeal 43, 34A Wn. (2d) 47, as amended.

Appellants' assignments of error, Nos. 7 through 10, inclusive, question the validity, accuracy, and acceptability of the appraiser's formula, the significant reliance of the trial court thereon, and the apparent refusal of the trial court to consider other evidence of value.

We are convinced that no divine revelation of truth inheres in the use of the formula. The formula is not an automatic, self-executing one, free from the touch of human hands, and immune from the fallibility of human judgment. The formula is not a mechanism that thrives and functions solely upon objective criteria, ultimate truths, or absolutes. It cannot be relied upon to reflect accurate and reliable dollars-and-cents figures relative to stock evaluation under any and all circumstances. Several factors, based upon personal experience, knowledge and background, were used by the appraiser to operate the formula. These judgments were certainly free from conscious bias; but they were, to say the least, somewhat subjective in nature. The foregoing statements are analytical, and certainly not derogatory of the appraiser and his qualifications.

In 10A Mertens, Law of Federal Income Taxation (1948 Revised) 57, § 59.29, we find the following significant statement:

"The value of stock can seldom be ascertained solely by the application of a mathematical formula. The courts do not regard with favor a valuation of stock *arbitrarily reached by the capitalization of earnings.* However, in the case of a close corporation capitalization of earnings by use of a mathematical formula may be the only method available for determining value. *A value so determined must*

*ordinarily give way in the face* of evidence of actual representative, sales. Earnings have, however, been frequently accepted as a basis for determining the value of shares of stock." (Italics ours.)

In justification of the use of the appraiser's formula, respondents quote from p. 111, Badger, Valuation of Industrial Securities (1925):

"In other words, in order to ascertain the value of closely held common stock it is merely necessary to apply a *proper ratio* to earnings, capitalizing them into a value for the stock. . . .

*"But what ratio shall be applied in a given case? The accuracy of our final result will surely depend in large measure upon the care with which the ratio used has been selected.* Our task of selecting a proper ratio will, no doubt, be greatly facilitated by a study of the relation between the market prices of active stocks and the earnings behind them." (Italics ours.)

While according some utility to the capitalization of earnings as a method for determining stock value, the preceding quotation contains the careful, cautious language, italicized above by us. This italicized language is indicative of the fact that the accuracy of the formula, the acceptability of a valuation produced by it, depends upon accuracy of judgment in choosing figures, factors, ratios, or percentages used in operating or applying the formula.

■ In his judgment as to the value of the net tangible assets, the appraiser rejected any consideration of equipment obligations outstanding against a number of new motor coaches purchased by Northwest Greyhound Lines, Inc. These were used in the operation of the business and, unquestionably, were devoted to the production of income. The corporation's equity in the new busses was considered and included in the figure representing the value of the net tangible assets. A portion of the net corporate earnings could be expected to be used to retire the equipment obligations regarding the new busses. Logically, in computing that portion of average annual net earnings to be assigned as a return on tangible assets, the item of equipment obligations should have been considered and included in the

figure representing the value of the net tangible assets. Appellants' contention seems well taken that the error is a sizable one. The equipment obligations on the new busses totaled $886,250. The appraiser's net tangible assets figure, adjusted on the basis of his judgment (requiring a 10% increase in value), was the sum of $3,296,702. Adding the value of the equipment obligations, $886,250, produces the sum of $4,182,952 for the value of the net tangible assets devoted to the production of earnings. Using 8% as a reasonable return to be attributed to the net tangible assets, produces the sum of $334,636, as the return or portion of annual earnings derived from net tangible assets. If the item of equipment obligations is excluded, the calculation of an *eight per cent* return produces the lesser sum of $263,736, as the total return or portion of the net average earnings attributable to tangible assets.

It is in the next step of the formula that the importance of the difference becomes apparent. The $263,736 (equipment obligations not considered) subtracted from the appraiser's estimated future annual earnings of $436,107, leaves $172,371 of the estimated future annual earnings to be *attributed to intangibles*. Subtracting $334,636 from the estimated annual earnings of $436,107, the remainder *attributable to intangibles* is $107,471.

Using *eight per cent* as the return attributable to intangibles—that is, using a multiplier of 12½ (8% times 12½ equals 100%)—produces, in the first instance, the sum of $2,154,637 (12½ times $172,371), as the value of the net intangible assets; in the other instance, using the same *eight per cent* return (12½ times $101,471), produces the lesser sum of $1,268,387, as the value of the net intangibles.

Using the appraiser's estimate of the value of the net tangible assets, $3,296,702, and adding the first figure of $2,154,637, produces the sum of $5,451,339, as the total value of the corporate tangible and intangible assets. This, divided by 67,644 shares, produces a per-share value of $80.59. Using the second figure above, $1,268,387, as an estimate of the value of the intangibles (the equipment obliations error being corrected), and adding the appraiser's estimated value of tangible assets in the sum of $3,296,702,

produces the sum of $4,565,089, as the estimated total value of the corporate tangible and intangible assets. Dividing this figure by 67,644 (total outstanding shares), produces the sum of $67.49, as the per-share value.

It was not solely an error in judgment but an error of mixed law and fact to exclude the equipment obligations. In *Plaut v. Smith,* 82 F. Supp. 42, 47, a tax case, the court, faced with a problem comparable to our problem regarding exclusion of the item of equipment obligations, said:

"Having in mind that the immediate problem is to ascertain (as a preliminary step in the method) the earnings produced by assets other than intangibles, I see no basis for the plaintiff's position in offsetting against those assets the corporate debentures and preferred stock. For instance, obviously the productivity of the plant would not be affected either by the amount of its long-term fixed debt or by the investment represented by capital stock. No one disputes that when in the final step of this method of valuation, the capitalized value of the intangibles is added to the net worth of the tangibles, then indeed the net worth should be ascertained by subtracting from the total tangible assets all liabilities which stand prior to the common stock, including the debentures and preferred stock. But that is another— the final—step. *The question now involved in this preliminary step of the method is not one as to net worth; it is rather one as to the volume of productive assets irrespective of fixed or of capital liabilities.* And for purposes of this step to reduce the productive tangible assets by the fixed debt ($500,000) and the preferred stock ($500,000), as the plaintiff contends, would constitute *an error of huge dimensions.*" (Italics ours.)

The net earnings of Northwest Greyhound Lines, Inc., from passengers carried for the years 1940 through 1949, inclusive, apparently were as follows:

| | |
|---|---|
| 1940 | $107,849 |
| 1941 | 120,015 |
| 1942 | 300,096 |
| 1943 | 449,856 |
| 1944 | 522,541 |
| 1945 | 498,468 |
| 1946 | 411,636 |
| 1947 | 406,139 |
| 1948 | 326,003 |
| 1949 | 308,075 |

It was the judgment of the appraiser that the years 1942 through 1948 were representative years in terms of arriving at his average annual net earnings figure. It is the contention of appellants that the years involved were not representative; that the years 1943 through 1945, inclusive, were war years when the company's earnings were abnormally high; and that there was a lengthy strike during each of the years 1946 and 1948. Appellants further contend that the last two mentioned years were therefore not representative, because of the strikes and for the reason that a post-war boom had continued in the motor stage transportation business during the two years. Appellants urge that the year 1949 is the only truly representative year for the purpose involved. That year, the net earnings of the company were $308,075.

█ We are convinced that the appraiser's judgment was erroneous in selecting the three war years, 1943 through 1945, inclusive, as representative years. We further believe the years 1946 and 1948 were not truly representative, because of the strikes. It would be our judgment that the years 1947 and 1949 were reasonably representative ones. Averaging the income of these two years produces a figure of $357,107, as a more accurate estimate of the average future net earnings of the company.

█ We think that the appraiser exercised reasonable judgment in the choice of *eight per cent* as the figure to be used in the capitalization of the net earnings attributable to tangibles. This appears to have been satisfactorily explained and supported by the appraiser's testimony at the hearing before the trial court. However, the 8% figure (multiplier of 12½), used somewhat differently by the appraiser in the last step of the formula to estimate the value of the net intangibles, is questionable. It is our opinion that 20%, as used by the Federal bureau of internal revenue in tax cases, might well have been more appropriate as the return to be attributed to net intangible assets and used to estimate their value.

1 Prentice-Hall Federal Tax Service 10,587, § 10,660, reads, in part, as follows:

"In the case, however, of valuation of good will of a business which consists of the manufacture or sale of standard articles of every-day necessity not subject to violent fluctuations and where the hazard is not so great, the Committee is of the opinion that the figure for determination of the return on tangible assets might be reduced from 10 to 8 or 9 per cent, and that the percentage for capitalization of the return upon intangibles might be reduced from 20 to 15 per cent."

Section 10,661, on page 10,588 of the same service, reads:

"There is given below a list of decisions, classified according to the percentages which were used in arriving at a valuation under A.R.M. 34 [§ 10,660]. The first percentage given is the return on tangibles, and the second the return on intangibles.

"8% and 15%

"Dwight & Lloyd Sintering Co., 1 BTA 179.

"Otis Steel Co., 6 BTA 358.

"Schilling Grain Co., 8 BTA 1048.

"Cushing v. U. S., 18 F. Supp. 83, 18 AFTR 1221.

"Toledo Newspaper Co., 2 TC 794

"John Q. Shunk et al., 10 TC 293 reversed on other grounds (6 Cir.; 1949), 173 F. 2d 747, 37 AFTR 1208.

"10% and 15%

"Shanley & Furners, Inc., 21 BTA 146.

"W. M. Ritter Lumber Co., 30 BTA 231.

"10% and 20%

"St. Louis Screw Co., 2 BTA 649.

"Pennsylvania Central Brewing Co., 9 BTA 264.

"Corning Glass Works, 9 BTA 771.

"Miscellaneous

"Central Consumers Wine & Liquor Co., 1 BTA 1190—10% on tangibles.

"Grant Trust & Savings Co., Trustees, 3 BTA 1026—8% and 33⅓%.

"C. F. Hovey Co., 4 BTA 175—8% and 20%

"Gould Coupler Co., 5 BTA 499—9% and 16⅔%.

"Ushco Mfg. Co., § 45,090; 45,099 P-H Memo TC affirmed (CCA-2; 1945), 151 F. 2d 821, 34 AFTR 386—8% and 15.2%

"William A. Boyd et al., § 46,221; 47,303 P.H. Memo TC, affirmed (6 Cir.; 1948), 171 F. (2d) 546, 37 AFTR 674—8% on tangibles, leaving intangibles valueless

"Plaut v. Smith (DC, Conn.), 82 F. Supp. 42, 37 AFTR 1036, affirmed Plaut v. Munford, Adm. (Smith) (2 Cir.; 1951), 188 F. 2d 543, § 72,356 P-H Fed. 1951—6%and 20%."

Our review of the use of the formula by the appraiser and the evidence relative thereto convinces us that the findings of the trial court as to the propriety of the use of the formula and the validity of the stock valuation produced thereby must be overturned.

The evidence shows that 3.2391 shares of The Greyhound Corporation stock (of a then total market value of $36.04) were offered for each share of stock in Northwest Greyhound Lines, Inc. R. D. McCornack and Mrs. Greig, dissenting stockholders and respondents herein, sold 900 and 400 shares, respectively, of their holdings in Northwest Greyhound Lines, Inc., for the sum of $30 per share, as participants in the parent company's agreement for the purchase of the majority stock of Messrs. Fitzgerald and Whiting. If their stock was worth no more than $30 at that time, and they were willing to part with 55% and 66⅔%, respectively, of their holdings at that figure, why was their stock worth almost three times as much on September 9, 1949? The record shows that, in the probate of the estate of Mary Frances McCornack, stock owned by the deceased was appraised for inheritance tax purposes by the tax commission of the state of Washington at the sum of $40. The appraiser learned about this probate appraisal or tax valuation after he had fixed the value of the stock at $80.59. The tax appraisal was emphasized at the hearing in the trial court. We regard the tax appraisal figure as highly significant against the validity of the $80.59 valuation of the stock. Subsequent to February, 1947, the corporation had acquired 98.26% of the stock. Further acquisitions were made at prices of $40.00, $42.75, and $50.00, for sizeable blocks of dissenting shareholders or hold-out stock.

We do not wish to emphasize "nuisance value," but frankly, we are influenced considerably by the fact that the parent corporation, on October 13, 1949, was willing to pay the sum of $50 for 340 shares of stock, coupled with an agreement that the sellers would be entitled to more, if the appraisal proceeding then in progress resulted in a higher valuation for the stock. The purpose of Rem. Supp. 1949, § 3803-41, is to resolve the conflicting interests of the

minority and majority stockholders in terms of dollars and cents to be paid for the dissenters' holdings. The statutory protection of minority interests affords a shield and not a sword to the dissenters. It would be a far cry from the basic purport of the statute to permit a small minority to thwart the best business judgment and interests of the majority by delaying, holding out, demanding and receiving any arbitrary and unconscionable sum for their stock.

■ The evidence in this case preponderates against the findings of the trial court, evaluating the stock at $80.59 per share. Considering all the facts and circumstances, the sum of $50 per share represents a fair, reasonable and just price from the standpoint of both the minority and the majority stockholders, and the parent corporation. Consummation of the merger should have been permitted on the basis of that figure.

In conclusion, it is interesting to note that the formula produces a value of $50.397 per share, as the value of the stock, if somewhat significantly different judgments are made in the choice of factors used in the application of the formula.

In other words, using (a) the years 1947 and 1949 as representative years to arrive at an estimate of future earnings, (b) correcting the item relative to equipment obligations, (c) considering 8% as the proper return regarding tangibles, and finally (d) considering 20% (as used by the Bureau of Internal Revenue) as a proper rate for capitalization of the value of intangibles, the formula works out as follows:

Average earnings (using 1947 and 1949 as representative years) $357,107

    Appraiser's (adjusted value) net tangibles... $3,296,702

    Adjustment re: equipment obligations.......   886,250

    Adjusted tangible value................ $4,182,952

Estimated annual earnings........ $357,107

8% return on $4,182,952..........   334,636

Remainder attributable to in-

    tangibles ................... $ 22,471

Intangibles ($22,471 capitalized at 20%, that

    is, multiplied by 5)....................   112,355

Value of net tangibles...................... 3,296,702

    Total value of assets...................... $3,409,057

Total value, $3,409,057, divided by 67,644 (shares), or $50.397 per share.

On the basis of our disposition of this appeal, one half of the expenses of the appraisal, including the fee and expenses of the appraiser, shall be charged to appellants, and one half to respondents (to be borne by respondents in proportion to their stock holdings); the parties hereto shall bear their own respective costs.

The case is remanded, with instructions that judgment be entered in accordance with the views expressed herein.

SCHWELLENBACH, C. J., HILL, HAMLEY, and OLSON, JJ., concur.