[No. 35397. *En Banc.* January 11, 1962.]

*In the Matter of the* WEST WATERWAY LUMBER COMPANY
*et al.*\*

\*Reported in 367 P. (2d) 807.

*Allen, DeGarmo & Leedy*, for appellant.

*Kumm, Maxwell, Petersen & Lee*, for respondents.

312

Finley, C. J.—The Douglas Fir Export Company was incorporated on December 3, 1913. Its bylaws state that the corporation was

". . . formed for the primary purpose of stimulating and enlarging the use of and market for Pacific Coast forest products in the foreign countries of the world, by the associating together of as many of the Pacific Coast lumber manufacturers as will join in the same, with a view of handling the foreign cargo shipments of such manufacturers for a brokerage commission sufficiently large to enable this corporation out of its net earnings to carry on an energetic and comprehensive plan for increasing such foreign trade in Pacific Coast lumber products, . . ."

The duration of the corporation was declared in the articles of incorporation to be fifty years, the maximum then allowed under this state's general corporation statute. 2 Rem. & Bal., § 3679. (It was suggested at oral argument that the Douglas Fir Export Company may have been incorporated under the provisions of Laws of 1913, chapter 19, which provided for "the formation and carrying on of co-operative associations." Cf. RCW 23.86. We have carefully compared the provisions of that act to appellant's articles of incorporation (which refer only to "the general incorporation laws of the state of Washington") and bylaws. The similarities of concept are striking, but there are sufficient deviations from the restrictions of chapter 19 that we cannot say as a matter of law that the incorporation of Douglas Fir Export Company was under or is to be controlled by the "co-operative associations" statute, and that those bylaws that are more liberal than the statute allows are futilities.)

Two thousand shares of stock, at $100 par value, are authorized. All shares, except qualifying shares held by the corporate directors, must be assigned by the shareholders to a trustee, who votes the shares entrusted to him as a block in accordance with the direction of the majority of shareholders. Under this voting trust arrangement, each shareholder, regardless of the number of shares owned, has only one vote. Only persons "actually engaged in the manufacture of lumber on the Pacific Coast" are eligible to own

shares. Further, the sales are restricted "so that no one manufacturer, individually or through affiliated interests, shall ever become a majority owner or holder or be able to exercise a dominating control" over the corporation.

The maximum annual dividend that may be paid on the shares of stock is seven per cent of par value. Dividends have been paid regularly in recent years. The directors are authorized to set the rate of brokerage commissions that shippers are to be charged. Earnings in excess of the authorized dividend are used for the operation of the export company, including the development of new or enlarged markets. When the directors feel that the income for a given year is more than enough to pay dividends and cover expenses, they are authorized to make rebates on all commissions received during the year.

Petitioners in the instant action are four lumber companies and the trustee in liquidation of a fifth. All five lumber companies are shareholders of the Douglas Fir Export Company, each owning ten shares. Four of the five petitioners discontinued the manufacture of lumber during the period from November 1957 to February 1959. The fifth petitioner, the West Waterway Lumber Company, continues to manufacture lumber.

On September 29, 1958, a two-thirds majority of the shareholders of the Douglas Fir Export Company voted to amend the articles of incorporation to provide for perpetual duration. The five petitioners dissented and followed the procedure prescribed in RCW 23.01.450 for an appraisal of their shares. The pertinent portions of RCW 23.01.450 are as follows:

"(1) If a corporation has . . . authorized an amendment which . . . extends the duration of the corporation . . . a shareholder who did not vote in favor of such corporate action . . . shall be paid the value of his shares *as of the date of the authorization of such corporate action* with interest thereon . . .

"(2) If, within thirty days after such corporate action was taken, the corporation . . . and any such shareholder cannot agree upon the value of the shares at the time such corporate action was authorized, the corporation or any

such shareholder may by petition filed in the superior court . . . ., within four months after the expiration of said period of thirty days, demand a determination of the value of the shares of all such shareholders as of the date of the authorization of such corporate action by an appraiser to be appointed by said court. . . . After hearing exceptions to the said report [of the appraiser], the court shall, by its decree, determine the value of the shares of the shareholders entitled to payment therefor . . ." (Italics ours.)

In *In re Northwest Greyhound Lines* (1952), 41 Wn. (2d) 672, 251 P. (2d) 607, we described the purpose and history of the dissenting shareholders' appraisal statute as follows:

"Business expediency has dictated the policy contemplated by the statute. In *Voeller v. Neilston Warehouse Co.*, 311 U. S. 531, 535, 85 L. Ed. 322, 61 S. Ct. 376, the court comments upon a similar Ohio statute as follows:

" 'The objective of the Ohio statute permitting the right of appraisal to dissenting shareholders was the elimination of abuses that had long been a fixture in the field of corporate finance. . . . At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to cooperate. To meet the situation, legislatures authorized the making of changes by majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares, were widely adopted.' "

To effect the purpose of the statute, "value" must be taken to mean what the shares would be worth if the proposed change in the corporation had not occurred. It would be illogical and unfair to allow the change to which the petitioners dissent to affect the compensation that they are to receive. If the value of a share in the corporate enterprise appreciates or diminishes because of the proposed amendment, the dissenters should not participate in the benefit or loss, because they voted against the act that caused it and are demanding that they be bought out. *Sterling v. Mayflower Hotel Corp.* (1952), 33 Del. Ch. 293,

93 A. (2d) 107, 38 A. L. R. (2d) 425; *Republic Finance & Inv. Co. v. Fenstermaker* (1937), 211 Ind. 251, 6 N. E. (2d) 541; Annotation: Valuation of stock of dissenting stockholders in case of consolidation or merger of corporation, sale of its assets, or the like, 38 A. L. R. (2d) 442; Comment, Corporations—Standard of Valuation of Dissenters' Stock under Appraisal Statutes, 51 Mich. L. Rev. 713.

Appellant excepted in the superior court to the value arrived at by the appraiser. The superior court received evidence and made its determination of the value of the dissenting companies' shares. The Export Company has appealed to this court, assigning error to a number of "findings of fact."

As of the date the amendment of the articles of incorporation was authorized, the net asset value of Douglas Fir Export Company was $423,489.29, of which $419,761.20 was cash. One hundred sixty shares of stock (all fully paid for) were outstanding. Both the appraiser and the trial judge concluded that the value of each share held by the dissenting group was $2,646.80, which is precisely the quotient of $423,489.29 divided by 160.

The essence of appellant's several assignments of error is that the trial court erred in not according weight or significance to a number of factors emphasized by appellant. Appellant urges most strenuously that the provisions of Article VI of the corporate bylaws cannot be disregarded. Art. VI defines eligibility of shareholders, requires assignment of shares to the trustee, prohibits unilateral control of the corporation, and concludes with the following:

" . . . in case of the death of any Stockholder or the dissolution of any corporate Stockholder or the insolvency or bankruptcy of any such Stockholder, or in case any such Stockholder voluntarily, for the period of one year, ceases to continue in the manufacture of lumber, *then and in that event this corporation shall have the right to call in, retire and cancel the capital stock so held by such Stockholder*, upon payment to the heirs, executors, trustees or successors in interest of such person or corporation, of an amount equal to the book value but not exceeding par value of such stock." (Italics ours.)

The finding of the trial court with respect to Art. VI was as follows:

" . . . The absence of a market value does not detract from the value of the stock for the purposes of RCW 23.01-.450. None of the facts or conditions outlined in Article VI of the by-laws existed as to these petitioners or any one of them on September 29, 1958 and said by-law was not intended to nor does it have any application to the valuation of stock under RCW 23.01.450."

We think the first sentence quoted above is correct. We cannot see how the absence of an established market price for shares of the Douglas Fir Export Company can detract from the value of the shares, whatever it may be. If a market price were available, it no doubt would have some influence on the process of valuation; the absence of a market price simply means that the court has fewer guides or standards to provide assistance in determining the value of corporate shares.

Respondents' arguments in support of the second quoted sentence of the finding may be summarized as follows:

The bylaw (1) is void (a) because of its restrictions on alienation, (b) the Export Company is not authorized to purchase its own shares, and (c) such a purchase would in fact be an unauthorized redemption of common stock; and (2) in any event, the restrictions are not applicable in the instant case.

In support of their argument (1) (a), respondents rely most heavily on *State ex rel. Howland v. Olympia Veneer Co.* (1926), 138 Wash. 144, 244 Pac. 261, in which a restrictive bylaw was held to be invalid. The restrictions on alienation were that no shares could be sold unless first offered to the corporation, and that no sale to another would be valid unless submitted to the board of directors for approval. The bylaws were supplemented by an agreement that sales to the corporation would be at market value. Three reasons for the invalidity of the bylaw were given in the opinion: (1) if the restriction were interpreted as authorizing the corporation to purchase its own shares it could not be upheld because at that time such an act was

unlawful; (2) if it were interpreted as meaning that the corporation would find an eligible buyer, the corporation had rejected the offer made to it by refusing to pay or to obtain payment of more than $1,500 for a share worth over $2,500; and (3) the bylaw, as the court interpreted it, was an attempt to make alienation subject to "the unrestrained will" of the directors. In support of the third ground, the court quoted the following language from 7 R. C. L. 263:

" . . . a by-law which provides that a transfer of stock shall be invalid unless approved by the board of directors or other representatives of the corporation is an invalid restraint upon the alienation of the corporate stock."

Although the quoted language, in the abstract, is undesirably broad, it does support the conclusion reached in the *Olympia Veneer Co.* case: that an attempt to give the directors of a corporation *uncontrolled* power over the alienation of its shares is invalid as an unreasonable restraint on alienation of personal property.

On the other hand, it has frequently been held that *reasonable* restraints on alienation of corporate shares are not objectionable. A restraint that is reasonable for one corporation may be unreasonable for another; restrictions that may pass the test of reasonableness when employed by a small, closely held corporation may be totally without justification if attempted by a large, widely held corporation. In the following cases a requirement that transfers of shares in the closely held corporations involved be approved by the directors or a certain number of other shareholders have been upheld: *People ex rel. Rudaitis v. Galskis* (1924), 233 Ill. App. 414; *Mason v. Mallard Tel. Co.* (1932), 213 Iowa 1076, 240 N. W. 671; *68 Beacon St., Inc. v. Sohier* (1934), 289 Mass. 354, 194 N. E. 303; *Longyear v. Hardman* (1914), 219 Mass. 405, 106 N. E. 1012; *Weisner v. 791 Park Ave. Corp.* (1958), 7 App. Div. (2d) 75, 180 N. Y. S. (2d) 734; *Wright v. Iredell Tel. Co.* (1921), 182 N. C. 308, 108 S. E. 744. See, also Cataldo, Stock Transfer Restrictions and the Closed Corporation. 37 Va. L. Rev. 229; O'Neal, Restrictions on Transfer of Stock in Closely Held Corpora-

tions: Planning and Drafting, 65 Harv. L. Rev. 773. Propositions that are continually emphasized in the above authorities are that the restrictions must be reasonable in view of the nature of the corporation involved, and that the persons whose approval is required must act in good faith and within the limits of their authority.

It is also commonly held that, where restrictions on alienation are not expressly or impliedly authorized by statute, they may be upheld as a part of the contract between the shareholders and the corporation if actually or constructively made known to the shareholder. *Lawson v. Household Finance Corp.* (1929), 17 Del. Ch. 1, 147 Atl. 312, affirmed (1930), 17 Del. Ch. 343, 152 Atl. 723; *Mason v. Mallard Tel. Co., supra; State ex rel. Normile v. Cooney* (1935), 100 Mont. 391, 47 P. (2d) 637.

Applying the foregoing reasoning to the facts of the instant case, we think it is clear that the restrictions on alienation in Art. VI are not, *per se*, invalid as against public policy.

█ Until the enactment of what is now RCW 23.01-.120 (2) in 1947, corporations could not repurchase shares of their own stock. *Jackson v. Colagrossi* (1957), 50 Wn. (2d) 572, 313 P. (2d) 697. RCW 23.01.120 reads, in part, as follows:

"(2) Every corporation organized hereunder shall have the power to purchase, hold, sell and transfer shares of its own capital stock:  . . ."

Respondents' argument is that the statute applies only to corporations organized subsequent to the passage of the Private Business Corporations Act in 1933. Appellant, in turn, points to RCW 23.01.900:

"Except where otherwise expressly stated herein, this chapter shall be applicable to any existing corporation formed under general incorporation laws of this state for a purpose or purposes for which a corporation might be formed under this chapter."

Respondents have suggested no reason, and we have thought of none, why the legislature would have intended

the amendment to apply only to post-1933 corporations. There is no logical justification for classifying corporations by date of incorporation with respect to the buy-back provision. Therefore, we conclude that the phrase "organized hereunder" does not expressly exclude pre-1933 corporations and make inapplicable the provisions of RCW 23.01-.900. Whatever limitations may have been in effect at an earlier time, the passage of the 1947 amendment to RCW 23.01.120 empowered the Export Company to repurchase its own shares.

Respondents suggest that the quoted portion of the bylaw is in fact a provision for redemption of common stock and as such is invalid. RCW 23.01.440 authorizes redemption of preferred shares, but no mention is made in the statute of redeeming shares of common stock. *Starring v. American Hair & Felt Co.* (1937), 21 Del. Ch. 380, 191 Atl. 887, held that the Delaware statute impliedly prohibited redemption of common shares by expressly authorizing redemption only of preferred.

We do not believe the bylaw may properly be construed as an attempt to authorize redemption. The purpose of the provision, when taken with the rest of the bylaws and with the articles of incorporation, is clear enough. Only persons defined as "legitimate manufacturers of lumber on the Pacific Coast" are entitled to own shares of the Export Company. A shareholder who dies or goes out of business no longer qualifies. In order to implement the reasonable restriction of eligibility, it is essential that the Export Company have available to it some means of enforcement. The power of the Export Company to reacquire its shares is not a continuing one; indeed, it arises only upon events not within its control. Redemption power, where it exists, usually enjoys a significantly different characteristic—aside from the controls imposed by law, it may be exercised at the will of the corporation, subject only to such restrictions regarding current financial status, impersonal selection of the group to be redeemed if less than the whole class is called, and such other limitations as may have been expressly stated.

Upon consideration of the terms of the bylaw in the context of the bylaws and the articles as a whole and the light they cast upon the nature of the particular corporation involved in the instant case, we conclude that Article VI does not contain a redemption provision. We are not called upon, therefore, to decide if *Starring v. American Hair & Felt Co., supra*, should be followed in this state.

■ We turn now to respondents' argument number (2), as we labeled it above. It is conceded by all parties that none of the events upon which the Export Company acquires power to repurchase its shares had occurred, with respect to respondents, on September 29, 1958. We do not believe this fact makes consideration of the repurchase provision inappropriate in the valuation proceedings. The potential ineligibility of any shareholder to continue to hold shares seems to us certain to affect the value of the interest owned, with respect to both the going concern value and the prospect of participating in the distribution of assets upon liquidation which we think should be considered in this case. The possible importance of the defeasible characteristic of the interest represented by shares of the Export Company may be illustrated by the decrease in recent years of the number of shares outstanding. In 1949, 290 shares were held by various lumber manufacturers; this figure was reduced to 280 in 1950; to 240 by 1953; to 180 in 1955; and to 160 in 1957. The number of withdrawals that were involuntary is not shown in the record. However, it may have been reasonable on September 29, 1958, to expect further withdrawals from appellant corporation. The interest of the remaining shareholders would increase while the value of the interest of the withdrawing shareholders would become fixed.

■ No universal formula for determining the value of shares of a corporation can be stated. No two corporations are precisely alike, and a consideration that may be very influential in evaluating the shares of one may be meaningless with reference to another. Appellant has cited many cases in support of the propositions (1) that "value" involves many factors that may be generalized as (a) market

*value* (which is not necessarily the same as market *price*); (b) net asset value, and (c) investment value; and (2) that no single factor or set of factors should be unduly emphasized. We agree with appellant in this respect, and have said in the past that

"Generally speaking, we believe that the word 'value' contemplates a consideration of all the facts and circumstances pertinent to a particular case in an effort to arrive at a fair and reasonable compromise or arbitration which may in some degree be lacking in mathematical exactness or certitude." *In re Northwest Greyhound Lines, supra.*

But we point out that one of the critical problems is to determine the point where emphasis becomes unduly light or heavy. See 13 Fletcher, Private Corporations, § 5899, fn. 95.

■ Appellant insists that the trial court unduly emphasized liquidation value. We are inclined to agree. Successive findings describe the net asset value of the corporation, and recite the fact that 160 shares were outstanding on September 29, 1958, and that the court concluded that the value of each was $2,646.80. Another finding of fact, so called, (No. 17) states:

"That the court in fixing the value took into consideration the dividend record of the corporation, the fact that stock had not been traded on the market, the nature of the corporation's business, the character and nature of the assets of the corporation, the fact that its future business prospects were good, the fact that the corporation pursuant to the statutes of the State of Washington under which it was incorporated would expire in 1963."

The recital notwithstanding, the record does not show how the "considerations" listed affected the trial court's final determination. We think the conclusion is inevitable that the trial court, and the appraiser as well, accorded weight only to the current liquidation value of the shares. We are convinced that, under the circumstances of this case, the trial court erred by overemphasizing current liquidation value and by dismissing other factors of considerable importance.

We think that a most (but not necessarily the only) significant factor in the valuation of respondents' shares is the fact that they represent an interest in a corporation, which, but for the amendment to the articles that touched off this lawsuit, would have been liquidated in five years. From all appearances, the net asset value of the corporation at that future time can be estimated without recourse to speculation. Since the articles do not provide for preferences upon dissolution, the surplus, after payment of debts and liquidation costs, would have to be equally allocated to the shares then outstanding. RCW 23.01.130 (3), RCW 23-.01.560. A share of the Douglas Fir Export Company, therefore, represented a substantial interest in the prospective distribution of assets.

The average year-end net asset value[1] for the ten-year period from 1949-1958 was $428,617.24; for the last five years of the period it was $428,961.58. There is nothing in the record to suggest that in the succeeding five years the corporation would sustain losses sufficient to change significantly this comparatively level capital structure.[2] There is substantial evidence in the record that business in the future will be good. Making assumptions favorable to the respondents, it is conceivable that by 1963 sufficient surplus would have accumulated to leave $430,000 for dis-

| [1]Year ending | Net Assets | Year ending | Net Assets |
|---|---|---|---|
| 12/31/58 ...... | $409,726.14* | 12/31/53 ...... | $430,643.67 |
| 12/31/57 ...... | 440,798.66 | 12/31/52 ...... | 432,711.56 |
| 12/31/56 ...... | 431,612.73 | 12/31/51 ...... | 456,663.01 |
| 12/31/55 ...... | 431,658.16 | 12/31/50 ...... | 410,381.41 |
| 12/31/54 ...... | 431,012.22 | 12/31/49 ...... | 410,964.84 |
| (Sub-total ..... | 2,144,807.91) | (Total ......... | $4,286,172.40) |

*The 1958 balance sheet does not balance. We trust the $10.00 discrepancy will upset the parties no more than it disturbs us. Respondents, as such, are entitled to the benefit of the doubt.

[2]A possible factor, upon which insufficient evidence was presented at the trial, is the likelihood that the directors would reduce or abolish commissions during the last five years, thereby substantially benefiting those who make the greatest use of the services of the corporation. The retained surplus and the eventual distributive shares would be correspondingly reduced.

tribution after liquidation, or $2,687.50 allocable to each of 160 shares. The commuted value of $2,687.50, at a low rate of three per cent over a five-year period, is $2,318.24. If we were to add a $7.00 dividend for each of the five years and assume compound interest of six per cent, a total of $39.46 (not troubling at present to calculate a commuted value), the value of each share would be raised to only $2,357.70, which is substantially less than the value found by the trial court. We do not intend to imply that the figures, interest, or discount rates employed above should have been selected by the trial court. We simply demonstrate why we believe many important factors were not given sufficient emphasis in the valuation process.

The decree of the trial court is reversed, and the cause is remanded with instructions to reconsider all of the relevant factors established by the evidence before it and to make new findings of fact and conclusions of law. The costs shall abide the final result of the action. It is so ordered.

MALLERY, HILL, DONWORTH, FOSTER, and HUNTER, JJ., concur.

WEAVER, J. (dissenting)—I agree with the conclusion, inherent in the majority opinion, that respondents are entitled to the value of their stock as of September 29, 1958. I do not agree, however, with the implication that the valuation of the stock is too high. I dissent, therefore, from the conclusion that it is necessary to reverse and remand this case.

". . . with instructions to reconsider all of the relevant factors established by the evidence before it and to make new findings of fact and conclusions of law."

This is not a situation where a corporation is "buying back" its corporate stock; nor is it one in which the corporation is redeeming its common stock. The question presented is the determination of respondents' rights, as dissenting minority stockholders, under RCW 23.01.450, which provides:

"(1) If a corporation has . . . authorized an amend-

ment which . . . extends the duration of the corporation . . . a shareholder who did not vote in favor of such corporate action . . . shall be paid *the value of his shares as of the date of the authorization of such corporate action* . . ." (Italics mine.)

The word "value" has many connotations, but, as used in the statute, it is synonymous with monetary worth. The crux of the problem is the phrase "value of his shares." In short, what is the amount of United States money that is equivalent to respondents' stock as of September 29, 1958.

There are many types of "value"; there are many methods of determining value; there are many different elements that must be considered in its determination; but all must have a definite relationship to the particular instance being considered.

The factual situation of the instant case is unique. September 29, 1958, appellant corporation had net assets of $423,489.29, of which $419,781.20 was in *cash*. Other assets consisted of $22,100.29 of accounts receivable and office furniture valued at $746.15. In other words, 99.119 per cent of the corporate assets was in cash. Each of the one hundred sixty outstanding shares of stock had a monetary equivalent in corporate assets of $2,623.50 in cash.

The court-appointed appraiser and the trial court valued the stock at $2,646.86—$23.30 per share more than its *cash* equivalent.

Under no theory or method of evaluation that might be considered applicable to this case can I conceive of the value of the stock being less than $2,623.50 per share unless we are to discount United States money.

The trial court may or may not have given a value to the accounts receivable and the office furniture. The court found, however,

"That the court in fixing the value took into consideration the dividend record of the corporation, the fact that stock had not been traded on the market, the nature of the corporation's business, the character and nature of the assets of the corporation, the fact that its future business prospects were good, the fact that the corporation pursuant

to the statutes of the State of Washington under which it was incorporated would expire in 1963."

It is true that the court's valuation per share may be computed by dividing net assets by the number of outstanding shares of stock; but, under the circumstances of this case, the trial court did not, to my mind, "unduly emphasize liquidation value."

There is nothing to be accomplished by the remand ordered by the majority opinion. I would affirm the judgment of the trial court.

ROSELLINI and OTT, JJ., concur with WEAVER, J.

