[No. 36420. Department Two. August 15, 1963.]

FRANK A. BURK, *Respondent*, v. COOPERATIVE FINANCE CORPORATION, *et al., Appellants.*\*

*MacDonald, Hoague & Bayless*, by *Francis Hoague*, for appellants.

*Sullivan, Redman & Winsor*, by *M. Chandler Redman*, for respondent.

FINLEY, J.—In 1953, Cooperative Finance Corporation (defendant-appellant, hereinafter referred to as CFC) was

\*Reported in 384 P. (2d) 618.

organized pursuant to RCW 23.86 as a cooperative corporation engaged in the finance business. Subsequently, on July 11, 1955, Frank Burk (plaintiff-respondent) purchased 45 shares of CFC preferred stock[1] from the cooperative for $4,500. These shares of preferred stock contained a statement that they were callable by the cooperative at their par value plus accumulated dividends. In the fall of 1957, Mr. Burk was interested in increasing the income from his investment and discussed the matter with Mr. Jordan, the treasurer and apparent manager of CFC. An arrangement was worked out whereby Mr. Jordan, as treasurer of CFC, signed a $4,500 promissory note calling for the payment of $74.58, plus 6 per cent interest on the declining balance, per month, and delivered the note to Mr. Burk in consideration for the repurchase of his 45 shares of CFC stock. A few months later, Mr. Burk again approached Mr. Jordan and offered to lend CFC $3,000 on the same terms as those embodied in the $4,500 promissory note. On January 1, 1958, a new promissory note for $7,342.98 (which represented the balance owing on the $4,500 note plus the $3,000 loan) was executed by Mr. Jordan, as the treasurer of CFC, and was delivered to Mr. Burk, who surrendered the $4,500 note.

Thereafter, CFC made monthly payments of $124.83, plus 6 per cent interest on the declining balance, until February 11, 1960, when payments were discontinued. Mr. Burk then commenced the instant suit against CFC and Mr. Jordan to recover the amount owing on the $7,342.98 promissory note.

CFC's defense to the suit on the note primarily was (1) that Jordan was acting outside the scope of his authority in executing the note, and it is not a valid obligation of the cooperative, and (2) that the portion of the note representing the $3,000 loan has been repaid in full, plus interest, and the remainder of the note fails for lack of consideration;

---

[1]Mr. Burk actually purchased 25 shares of class A preferred and 20 shares of class B preferred, which provided for the payment of 5 per cent and 6 per cent cumulative dividends, respectively. However, the differences in these classes of stock are immaterial with reference to this appeal.

*i.e.*, the cooperative could not repurchase its own stock, hence a note given for such a "repurchase" fails for lack of consideration. The trial judge, sitting as the trier of fact, found that CFC was liable on the note, entered judgment accordingly, and also dismissed Mr. Jordan from the action.

The trial court made findings to the effect that (1) the repurchase of stock by the cooperative was lawful, (2) the cooperative is estopped to deny the validity of the repurchase, and (3) Jordan was acting within his corporate authority in executing the note; or, in the alternative, the cooperative has ratified his action and is estopped to deny his authority.

The crucial question, and the one which must be initially answered, is whether CFC could validly repurchase its own stock. The only provision in RCW 23.86 relating to the repurchase of stock by a cooperative is in RCW 23.86.110, which provides in part:

". . . For the purpose of equalizing the stock ownership of its stockholders any such association may from time to time purchase stock from any stockholder. Such association may also purchase the stock of any stockholder who ceases to produce for the association any of the commodities in which it deals. Payment for any stock purchased may be made out of any available funds whether surplus or not."

The above quoted provision was enacted by the legislature in Laws of 1925, Ex. Ses., chapter 99, § 2, p. 149, the title to which reads:

"An Act relating to Co-operative Associations; authorizing such associations to purchase their own stock *under certain conditions*; . . ." (Italics ours.)

The certain conditions under which a cooperative may repurchase its own stock, *even in the absence of a surplus*, as set forth in RCW 23.86.110, are (1) the equalization of stock holdings, or (2) the purchase of stock owned by a stockholder who no longer produces for the cooperative.

The repurchase of stock in the instant case involved the totality of Burk's stock; hence there is no allegation or evidence rendering the equalization aspect of RCW 23.86.110 applicable. Nor is the second aspect of RCW 23.86.110 ap-

plicable. It is rather obvious that a necessary condition precedent to ceasing an activity is the existence of some activity. CFC is engaged in the business of making loans, and Burk was never a producer for the cooperative in the sense in which the term is used in the statute, and, therefore, it cannot be said that he ceased to be a producer.

The preceding discourse adequately indicates that RCW 23.86.110, which is the only provision in RCW 23.86 relating to the repurchase of stock, is not applicable in the instant case. However, this conclusion is not dispositive of the question of whether a cooperative can repurchase its own stock. RCW 23.86.110 grants cooperatives plenary power to repurchase their own stock in the two previously mentioned situations. This authority to repurchase, even in the absence of a surplus, does not negate the possibility of repurchases under some limited authority; *e.g.*, repurchases out of surplus. As to legislative authorization with regard to possible repurchase powers other than the provisions contained in RCW 23.86.110, our legislature has been silent.

In examining the general corporation statutes (RCW 23.01) and the cooperative corporation statutes (RCW 23-.86) respecting stock, we find parallelism to a substantial degree. For example: RCW 23.01.030(f), coupled with RCW 23.01.050, and RCW 23.86.050(5), coupled with RCW 23.86.060, require the filing of a statement indicating the amount of capital stock with the Secretary of State, and any subsequent reductions of capital stock must be reported to the Secretary of State (RCW 23.01.430 and RCW 23.86-.090). RCW 23.01.060 and RCW 23.86.040 state that the subscriber to shares of stock is liable for the unpaid balance, and stock must be fully paid prior to the issuance of stock certificates (RCW 23.01.160 and RCW 23.86.110). This parallelism, coupled with the fact that a cooperative corporation is a special kind of corporate entity, leads us to examine legal principles applicable to corporations with regard to the repurchase of stock.

The majority of American jurisdictions have held that a solvent corporation may legally repurchase its own stock

in the absence of some express restriction. See: Fletcher: Cyclopedia Corporations (1950 ed.) § 2848. Historically, this jurisdiction has had such an express restriction. The Washington Territorial Legislature, in enacting the first comprehensive corporation act in this jurisdiction, provided in Laws of 1865, § 13, pp. 60-61:

"It shall not be lawful for the trustees to make any dividend, except from the net profits arising from the business of the corporation; nor divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the company, . . ."

The same language appears in: Laws of 1869, ch. 1, § 13, p. 334; Laws of 1873, ch. 1, § 13, p. 402; Laws of 1881, ch. 185 § 2433, p. 419 (1 H.C. § 1510); and Laws of 1923, ch. 168, § 2, p. 543 (Rem. Rev. Stat., § 3823).

With regard to the above quoted statutory provision, the court stated in *Barto v. Nix* (1896), 15 Wash. 563, 568, 46 Pac. 1033:

". . . It may be conceded that a corporation in this state cannot traffic in its own stock. Such we believe to be the rule established in all the states having similar statutory provisions. . . ."

Similar statements were made in *Mitchell v. Blue Star Mining Co.* (1917), 98 Wash. 191, 167 Pac. 130; *Tait v. Pigott* (1903), 32 Wash. 344, 73 Pac. 364 (which refers to the statute as being § 4265 Bal. Code); and *Yeaton v. Eagle Oil & Refining Co.* (1892), 4 Wash. 183, 29 Pac. 1051.

The Uniform Business Corporation Act, which was enacted as chapter 185 of Laws of 1933, neither explicitly nor implicitly[2] repealed the previously quoted prohibition relating to the repurchase of stock by a corporation. The continued virility of this prohibition was recognized by this court in *Whittaker v. Weller* (1941), 8 Wn. (2d) 18, 21, 111 P. (2d) 218, wherein we stated:

[2]In *Whittaker v. Weller* (1941), 8 Wn. (2d) 18, 111 P. (2d) 218, it was stated: "Whether it [the statutory prohibition against repurchasing stock] was repealed by implication is immaterial, . . ." This language which might have been construed to mean that there actually had been a repeal by implication was ordered stricken from the opinion in *Whittaker v. Weller* (1941), 10 Wn. (2d) 724, 117 P. (2d) 224.

" . . . it has long been the law of this state, beginning with the case of *Tait v. Pigott,* 32 Wash. 344, 73 Pac. 364 [it has been previously indicated in this opinion that *Tait* relied upon the statutory prohibition], . . . that a corporation in this state cannot traffic in its own stock, and that the capital stock of the corporation is a trust fund for the payment of its debts. . . ."

The long established statutory prohibition which prevented corporations from repurchasing their own stock was repealed by the Laws of 1947, chapter 195, § 2, p. 840 (RCW 23.01.120):

"Every corporation organized hereunder shall have the power to purchase, hold, sell and transfer shares of its own capital stock: *Provided,* That no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital stock of the corporation."

Therefore, at the present time in the state of Washington a general business corporation, organized pursuant to RCW 23.01, may repurchase its own stock, provided such repurchases do not impair the capital stock.

The existence of the statutory provisions previously discussed have made it unnecessary for this court to resolve the question of whether, in the absence of statutory authorization, a corporation can repurchase its own stock. Some of the older cases in this jurisdiction—*e.g., Duddy-Robinson Co. v. Taylor* (1926), 137 Wash. 304, 242 Pac. 21; *Kom v. Cody Detective Agency* (1913), 76 Wash. 540, 136 Pac. 1155—make reference to a public policy prohibiting a corporation from repurchasing its own shares; but it must be borne in mind that "public policy" was *then embodied* in a *specific statute.* Whereas, some of the more recent cases—*e.g., Whittaker v. Weller, supra*—refer to the trust fund doctrine as being a part of the common law of this state, and the cases cited in support thereof relate to the protection of creditors. The "trust fund doctrine" is for the protection of creditors, *Terhune v. Weise* (1925), 132 Wash. 208, 231 Pac. 954, 38 A.L.R. 94; therefore, if a corporation made a repurchase in good faith and without

prejudice to the rights of its creditors, the trust fund doctrine would not seem to be a basis for completely denying a corporation the opportunity to repurchase its own shares of stock.[3]

The foregoing resumé indicates that this jurisdiction has always had either a specific statutory prohibition or a specific statutory authorization relating to a general corporation's power to repurchase its own stock. Although this court has been presented with cases involving stock repurchases, it has never had to rule definitively upon the question of whether a corporation may repurchase its own stock in the absence of statutory authorization. Therefore, reference to general corporation case law of Washington, analogizing general corporations and cooperatives, relative to the repurchase of stock does not significantly contribute to the solving of the problem presented in the instant case.

Cooperatives have been traditionally regarded as being homogeneous groups having a certain sense of unity. Legislatures, while permitting cooperatives to enjoy the benefits derived from their existence as legal entities, have sought to preserve the beneficial effects of the voluntary associations and further their common interests. See: *Stuttgart Co-op. Buyers Ass'n v. Louisiana Oil Refining Corp.* (1937), 194 Ark. 779, 109 S. W. (2d) 682. This is manifested in part by the fact that cooperatives are permitted a greater control over a member's power to transfer stock than are general corporations, and has been referred to as the power of a cooperative to preserve the integrity of its membership. Evans & Stokdyk, "The Law of Co-operative Marketing," (1937) p. 22.

Washington, as do many other jurisdictions, limits the number of shares that any one person can own in a cooperative, and provides that each member shall have one,

---

[3]"The underlying reason for limiting share purchases [by a corporation] springs from the necessity of imposing safeguards against the depletion by a corporation of its assets and the impairment of its capital needed for the protection of creditors. . . ." Ballantine on Corporations (1946), p. 605.

and only one, vote regardless of the number of shares owned (RCW 23.86.110). These limitations on voting power, the extent of ownership, and restrictions on transferability of shares definitely tend to limit the marketability of cooperative shares. Nieman, in his article, "Revolving Capital in Stock Cooperative Corporations," 13 Law & Contemp. Prob. 393 (1948), made the observation that

"There is a growing realization that the capital of a cooperative, so far as the permanency or impermanency of the shares or other units of the capital is concerned, is essentially different from the capital of other business corporations. Corporate capital ordinarily represents a permanent investment for the purpose of producing a recurring income to the investor. The share holder does not expect that the capital which he contributed will be returned to him until dissolution. He understands that, prior to dissolution, he can recover the amount of his contribution, more or less, only by selling and transferring his shares to a purchaser which sometimes may be, but ordinarily is not, the corporation. A cooperative's capital, however, more often represents essentially a loan or temporary contribution by its patrons. . . . He looks to the cooperative to return his capital contributions to him if, and as soon as, it can do so."

Packel, in "Law of Cooperatives" (3d ed.), p. 130, states:

" . . . payment on shares can be recovered from a solvent cooperative irrespective of the limitations which may exist upon the power of an ordinary corporation to purchase its own shares. . . ."

This approach was followed by the Oklahoma Supreme Court in *Farmers Union Co-op. Gin Co. of Warren v. Taylor* (1946), 197 Okla. 495, 172 P. (2d) 775, wherein the court refused to apply a statutory restriction placed upon general corporations, with reference to the repurchase of stock, to cooperatives. This indicates a greater scope of permissiveness with regard to repurchases of stock by cooperatives.

■ Having considered some of the similarities and differences of cooperative and corporation stock in view of precedents we have examined, we are faced in the last

analysis with a choice as to whether cooperatives may repurchase their own stock. As previously pointed out, Washington permits all general corporations, regardless of the date of incorporation, to repurchase their own stock so long as it does not impair capital stock. See: *In re West Waterway Lbr. Co.* (1962), 59 Wn. (2d) 310, 367 P. (2d) 807. Since it would seem rather anomalous to impose greater restrictions upon cooperatives, which are normally given greater leeway than general corporations with regard to stock repurchases, than presently exist upon the general corporations of this jurisdiction, we conclude that a cooperative may repurchase its own stock so long as it does not impair capital stock. This conclusion harmonizes with the majority of American jurisdictions and the authorization of RCW 23.86.110 to repurchase in certain conditions even in the absence of a surplus.

In the instant case the trial court excluded, as immaterial, evidence pertaining to the impairment of the cooperative's capital. It is obvious from the preceding discussion that we do not agree with that conclusion of the trial court. In light of the exclusion of that evidence, the only theory upon which the trial court can be affirmed is estoppel. That is, the cooperative is estopped to deny the validity of the repurchase transaction.

In findings of fact Nos. 4 and 5, to which no error has been assigned, the trial court found: that the Board of Trustees of the cooperative association was aware of the fact that Jordan was redeeming preferred stock of the cooperative from 1953 through 1958, and Jordan made monthly financial reports to the Board of Trustees regarding the indebtedness of the cooperative and the number of preferred shares of stock outstanding, and the Board of Trustees filed with the minutes of its November 1958 meeting a written report for November 1958, which specifically listed the promissory note of January 1, 1958, payable to Burk.

When Mr. Jordan, acting on behalf of the cooperative, and Mr. Burk executed the repurchase agreement in the

fall of 1957, they may have relied upon Article IV of the Amended Articles of Incorporation of CFC and the stock certificates themselves, wherein it was stated that the stock was callable by the cooperative upon the giving of the shareholder 30 days written notice. There is nothing in the record indicating lack of good faith by Mr. Burk when the repurchase agreement was executed. And, commencing with the execution of the note given in consideration for the delivery of the repurchased stock to the cooperative, CFC regularly made the monthly payments provided for in the original and then the substituted note. These payments were made to Mr. Burk for over 2 years, and it was only after CFC stopped making the monthly payments in February 1960 that Mr. Burk discovered that the refusal to make any further payments was predicated upon the hypothesis that CFC could not legally repurchase its own stock.

In the interim between the execution of the repurchase agreement and the cessation of payments over 2 years later, Mr. Burk had lent CFC $3,000, and had relinquished all his rights as a stockholder; *e.g.,* the opportunity to seek a buyer for his shares. We can, therefore, agree with the trial court that the factual pattern is sufficient to warrant the invocation of the doctrine of estoppel, if we find that estoppel is applicable to this situation.

The only Washington case we have found in which a corporation was estopped to deny the validity of a stock repurchase transaction is *Miller v. Washington Southern R. Co.* (1895), 11 Wash. 414, 39 Pac. 673. The Satsop Railroad Company gave Miller two $5,000 notes in consideration for the repurchase of his stock. Subsequently, the Washington Southern, having full knowledge of the transaction with Miller, assumed all of Satsop Railroad's debts. Nearly 2 years later, when Miller instituted suit to recover on the notes, it was held that Washington Southern was estopped to deny the validity of the repurchase transaction. The factor which distinguishes the *Miller* case from other Washington cases is the fact that the corporation which was

estopped had not participated in the transaction, nor was its stock involved.

*Kom v. Cody Detective Agency, supra,* is rather analogous to the instant case. In that case a stockholder sought to compel a corporation to pay the $750 remaining due on a $1,000 contract for the repurchase of stock. This court, on the basis that a repurchase of stock was illegal, upheld the refusal of the corporation to make any further payments on the contract. Although estoppel was not mentioned in the *Kom* case, it seems implicit that estoppel was not available therein.

Another case which should be considered is *Duddy-Robinson Co. v. Taylor, supra.* The directors and officers of the corporation repurchased Taylor's stock for $10,099.56, and nearly 2 years later the corporation brought an action to recover the funds paid to Taylor for the repurchase of his stock. The trial court held that both parties had participated in an illegal act—the repurchase of stock—and being in *pari delicto* refused to aid either party. On appeal the trial court was reversed, and the corporation was permitted to recover the funds which had been previously delivered to the stockholder for the repurchase of his stock. This was on the basis that the repurchase of stock was illegal.

■ The foundation for the conclusion in both *Kom* and *Duddy-Robinson* was the specific statutory prohibition in effect at that time: that a repurchase of stock was illegal. Implicit within those decisions is the concept that estoppel is not applicable because the application of that doctrine would tend to defeat the specific statutory prohibition. Although this jurisdiction no longer has a blanket statutory prohibition, there do exist limitations upon the scope of permissive repurchases. Therefore, the same considerations which rendered estoppel inapplicable in the above mentioned cases also apply to the instant situation.

We have previously determined that in all situations, other than those encompassed by RCW 23.86.110, cooperatives may repurchase their own stock, provided that such repurchases do not impair capital stock. Thus it is neces-

sary to remand this action to the trial court in order to ascertain whether the repurchase impairs capital stock.

The scope of the repurchase authority conferred upon cooperatives is the same as that now conferred upon general corporations by RCW 23.01.120(2). In *Jackson v. Colagrossi* (1957), 50 Wn. (2d) 572, 313 P. (2d) 697, and 23 Wash. L. Rev. 149 (1948), it was pointed out that RCW 23.01.120(2) is copied almost verbatim from a Delaware statute, and we thus follow the construction placed upon the statute by Delaware. See: *Jackson v. Colagrossi, supra,* at p. 575 for the construction placed on the statute.

*In re Vulcan Soot Cleaner Co.* (1935), 11 F. Supp. 388 (W.D. Pa.) involved the application of the aforementioned Delaware statute. In that case it was held that, notwithstanding the fact that the corporation was solvent when a note was issued in payment for a stock repurchase, the right to payment on the note depended upon the solvency of the corporation at the time the note became due. The same conclusion was reached when a West Virginia statute identical to the Delaware statute was involved; *Jarroll Coal Co. Inc. v. Lewis* (1954), 210 F. (2d) 578 (4th Cir.) 47 A.L.R. (2d) 753. For additional citations see: *Boggs v. Fleming* (1933), 66 F. (2d) 859 (4th Cir.); and *In re Fechheimer Fishel Co.* (1914), 212 Fed. 357 (2d Cir.) which has a rather complete discussion of the problem. Hence, in the instant case, the inquiry as to the impairment of capital should be directed to the time at which the obligations on the note matured.

The original note, executed by CFC in the fall of 1957 for the repurchase of Mr. Burk's stock, called for monthly payments of $74.58, plus 6 per cent interest. The note here in dispute was given in 1958 in exchange for a $3,000 loan and the return of the earlier $4,500 note. This new note called for the payment of $124.83, plus 6 per cent interest per month. CFC made the payments as called for in the notes until February 1960; and it now seeks to have this court allocate the entire amount of the payments to the portion of the note representing the $3,000 loan. The au-

thority relied upon to make such an allocation is *Schreiber v. San Joaquin Exploration Co.* (1954), 125 Cal. App. (2d) 171, 270 P. (2d) 19. In that case Schreiber brought an action to foreclose upon security for a $24,000 promissory note that had been issued by the corporation. The court found that the note had been given in consideration for the assumption of $16,000 of corporate obligations and the repurchase of $8,000 of corporate stock. It was found that there was a failure of consideration for the $8,000 portion of the note, because a corporation could not legally repurchase its own stock. The court then severed the valid from the invalid portion of the note and permitted recovery for $16,000.

We accept and follow the approach taken by the court in the *Schreiber* case, but this does not compel us to allocate all of the past payments to the loan portion of the note. While dividing the note into component parts, we find it equally logical and compelling to divide the prior payments between the two respective and pertinent portions. The ratio between the balance owing on the $4,500 repurchase note and the $3,000 loan when the disputed note was issued is virtually the same as the ratio between the original monthly payments of $74.58 and the additional payment of $50.25 called for by the instant note. This proration is justifiable, because, as previously discussed, the repurchase of stock is not void in its inception; rather, it is the impairment of capital resulting from repurchase payments which is verboten. Thus there remains a balance still due and owing on both loan and repurchase aspects of the note. Furthermore, the cooperative cannot invoke the doctrine of *ultra vires* to that portion of the repurchase agreement which is no longer executory. See: 47 Yale L. Rev. 1164 (1937). And, in the instant case, only the payments which have not yet been made are still executory.

It would tend to extend this opinion unduly to elaborate extensively the rationale utilized in reaching our conclusion that the evidence substantially supports the conclusion of the trial court that Jordan was acting within his corporate

authority in executing the note, or, in the alternative, that the cooperative has ratified his action and is now estopped to deny his authority.

It is hereby ordered that this cause be remanded for further proceedings consistent with the views herein expressed. The parties will bear their own costs.

OTT, C. J., DONWORTH, WEAVER, and HAMILTON, JJ., concur.