[No. 29349-4-I.    Division One.    December 21, 1992.]

J. DAVID ROBBLEE, ET AL, *Respondents*, v. NEIL H.
ROBBLEE, ET AL, *Appellants*.

*Dexter A. Washburn* and *Mikkelborg, Broz, Wells & Fryer,* for appellants.

*Patrick S. Brady* and *Ginsberg, Stanich & Dufford,* for respondents.

SCHOLFIELD, J. — Neil Robblee appeals the trial court's division of assets between him and his brother David Robblee, contending the trial court erred in applying a minority discount to the value of his shares, and erred in failing to award prejudgment interest and attorney's fees. We remand to the trial court to remove the minority discount, and affirm in all other respects.

## FACTS

Six Robblees, Inc. (SRI), is a Washington corporation that sells truck parts through branches in five western states. J. David Robblee (Dave) and Neil H. Robblee (Neil) are brothers. Their uncles and father started SRI in Tacoma in 1913. Dave joined SRI in 1966, and in 1976 succeeded his father as president and general manager. Neil joined SRI in 1976, and handled in-house legal matters for SRI and was in charge of office functions.

By 1984 Dave owned 51 percent and Neil 29.56 percent of the outstanding SRI common stock. Both were directors. Family members, directly and through trusts, owned the other shares in SRI.

In addition to their interest in SRI, Dave and Neil owned and were equal partners in Robblee Associates (RA). This partnership owned properties in Anchorage, Fairbanks, Spokane, Yakima, and a condominium in Maui. SRI operated branches in the buildings in the various cities, leasing the property from RA. The Karluck Building in Anchorage was sold in May of 1984, with RA retaining the right to receive any proceeds from a condemnation of part of the property.

In April 1984, Neil talked to Dave about becoming an equal shareholder in SRI. Dave was not willing to give up his 51 percent control. The relationship between the brothers quickly deteriorated, and Dave terminated Neil's employment in July of 1984.

Both brothers agreed to engage Michael L. Cohen to mediate the dispute. Cohen's efforts resulted in a letter of intent dated September 28, 1984, that outlined a plan for dividing assets and resolving disputes. Although the agreement was incomplete and on some points ambiguous, the parties stipulated to its enforceability, stating that the court was to apply it in resolving this lawsuit.

The court found that during a period of up to 2 years (or longer if extended), Dave was to have sole management authority over SRI, and Neil was to have sole management authority over RA. This interim arrangement would not affect either brother's equity interest in either SRI or RA. During this period, Neil was to remain an SRI director and employee and receive his SRI salary and benefits, but would not participate in SRI management decisions unless requested by Dave.

Dave and Neil were to determine the difference in value between Neil's interest in SRI and Dave's partnership interest in RA. They would then acquire, probably through SRI, a third company with a value equal to that difference in value. The third company and Dave's interest in RA would be transferred to Neil in exchange for Neil's interest in SRI. Thus, Dave would get all of Neil's stock in SRI; Neil would get all of RA plus the third company. As a part of this exchange, Neil would refund to SRI any portion of the salary and benefits he had received during the interim period that had not been earned through his services for SRI, RA, or any other family business. There would be no further accounting for the operation of SRI or RA during the 2-year period, and payments on unsecured loans from SRI to RA, including an open account to buy property in various cities, were to be deferred during the interim period.

After entering into the letter of intent, the parties took some steps to comply with the agreement. Dave managed SRI without Neil's interference, and Neil managed RA without Dave's interference. Neil was paid the contemplated salary and benefits. In addition, Neil set up a new partnership, Mt. Baker Associates, to which all the RA properties were transferred. Neither party interfered with the other's rights as a minority shareholder or partner. However, the parties did not reach agreement on values or on acquiring a third company. The parties agreed that this failure was not the result of bad faith.

When the 2-year period expired September 30, 1986, matters deteriorated. Beginning October 1, 1986, SRI stopped paying rent for the four properties SRI leased from RA, claiming it was offsetting the rental payments against the loans owed by RA to SRI. Dave took steps to remove Neil from the board of directors of SRI. No rental payments were made until 1990. Neil filed suit for unpaid rent against SRI in Yakima County. Subsequently, Dave brought suit against Neil in King County to resolve all issues. The Yakima action was transferred to King County, and the suits were consolidated.

As of October 1, 1989, SRI had withheld $135,408.14 in rent over the amount owed by Neil on the open account and note.

Between August 1, 1989, and July 13, 1990, Dave, individually, and SRI made payments totaling $196,579.46 to creditors of RA on obligations for which Neil, as the result of the letter of intent, was the primary obligor. These payments were made after Neil failed to make the payments as they became due. The court found Dave was entitled to a separate judgment for the $101,875.23 he paid individually, with prejudgment interest.

The court concluded that the unpaid rent, the open account, the promissory note, and the amount paid by SRI and Dave to creditors of RA were liquidated amounts, and in calculating the amount owed certain offsets should be applied, first

against accrued interest and then against principal. The unpaid rent was first set off against the promissory note (to the monthly amount of $2,256.69 until maturity, and the monthly amount of $21,716.17 thereafter), then against the open account, and finally against the SRI payments to RA creditors. Interest was calculated on the open account at the adjusted federal rate (AFR); on the note at the rate set forth in the note; and at the prejudgment rate on other balances and amounts.

Both sides offered evidence as to the fair market value of SRI. The court split the difference, concluding that the fair market value of SRI as of September 30, 1984, was $3,420,000, or $36.12 per share. The letter of intent did not say how Neil's interest was to be valued, that is, by fair value, fair market value, or any other measure of value. In its memorandum decision, the court stated its reasoning:

> Both valuation experts agreed that to get from the fair market value of a closely held corporation to the fair market value of a minority interest, one must apply a significant discount. The benefits of minority ownership are too tenuous, the possibility of abuse by the majority too great, for the market to value a minority interest anywhere close to the market value of the majority share. If fair market value were the measure of what Dave should pay for Neil's share, the fair market value of $36.12 per share would have to be discounted by 25% to determine the fair market value of Neil's minority interest. The fair market value of Neil's 29.56% is $27.09 per share.
>
> Neil contends there should be no minority discount, arguing there [have] been oppressive majority shareholder actions that would be rewarded if Dave had to pay only the discounted value of Neil's stock. The court finds there were no oppressive actions on the part of Dave that would justify forcing Dave to pay full market value for Neil's stock. The rationale of minority squeeze out cases does not apply here.
>
> Neil also suggests that the cases where courts have awarded "fair value" rather than fair market value provide an example of what should be done here. *See Columbia Management Co. v. [Wyss,* 94 Or. App. 195, 765 P.2d 207 (1988)]. A dissenter shareholder situation is closer to what we have than is a minority squeeze out or voluntary sale to a third part[y].
>
> In this case Neil's stock will not be sold to a third party; rather, it will go to Dave. Given the history of the relationship

between Dave and Neil, the Letter of Intent agreement out of which this dispute in part arises, and what was contemplated but not done and which cannot now be done by the court to carry out the Letter of Intent, the court concludes that the value Dave should pay for Neil's stock must take into account, in addition to the fair market value of a minority interest, the value of that stock to Dave. Dave's ownership will go to almost 80% and he will be ridding himself of a minority shareholder who had become, and would continue to be, extremely difficult. In this context, the value to Dave of Neil's 29.54% is greater than its value to a third party. Dave will be getting the stock and shedding trouble.

Considering all of these factors, the court has concluded that to implement the Letter of Intent, the fair amount Dave should pay to Neil is $31.61 per share.

As to attorney's fees, the letter of intent contained the following provision:

breach of this letter of intent may give rise to substantial damages which may be sought against the breaching party in the Superior Courts of the State of Washington. In such an event the prevailing party shall be entitled to all costs and attorney's fees paid by the non-prevailing party.

The court stated in its memorandum decision that neither party breached the letter of intent "in a manner that calls for application of the attorneys fee provision", by, for example, taking actions that, if it were not for the letter of intent, could have been addressed through assertion of legal rights (such as the rights of a partner or a minority shareholder). Thus, the court determined that neither party is entitled to attorney's fees under the letter of intent.

Two judgments were entered in September 1991, one in favor of David, one in favor of Neil. Neil appeals from both judgments.

## MINORITY DISCOUNT

Arguing that his shares should have been valued without a minority discount, Neil assigns error to finding of fact 18, in which the court determined that Dave did not engage in oppressive actions toward Neil as a minority shareholder, and finding of fact 19, which specifies $32.17 as the appropriate price per share.[1]

---

[1]Both of these findings of fact are arguably conclusions of law. A conclusion of law which is erroneously described as a finding of fact is reviewed as a conclu-

Neil contends his shares should not have been subjected to a fair market discount for two reasons: (1) he was an oppressed minority shareholder at whose expense the oppressive majority shareholder (Dave) should not benefit, or (2) he was in effect a dissenting shareholder, to which no fair market discount applies. Dave testified that he and Neil, at the time of signing the letter of intent, did not discuss whether to apply a fair market value discount to Neil's minority shares of SRI stock.

As to the first issue, the trial court determined that Neil was not oppressed, finding that the fighting between Dave and Neil "was initiated as much if not more by Neil, and both have kept the disputes going." Finding of fact 18. Neil argues that oppression existed as a matter of law because Dave "fired" Neil, Dave tried to remove Neil as an officer and director, and Dave changed the SRI organization to take over Neil's functions.

We find substantial evidence to support the trial court's finding that Neil initiated much of the fighting and was equally responsible for keeping the disputes going.[2] We also

---

sion of law. *Woodruff v. McClellan*, 95 Wn.2d 394, 396, 622 P.2d 1268 (1980). On appeal, review of the findings and conclusions is restricted to determining whether the findings are supported by substantial evidence and, if so, whether the findings support the trial court's conclusions of law and judgment. *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978).

[2]In April of 1984, Neil told Dave he wanted 50 percent of the company stock. Dave testified:

I stated that in order for him to get 50 percent, he would have to buy out all of his brothers and sisters, and he would have to buy part of my stock. That's the only way it was possible.

He got very angry, and we ended in a very unpleasant ending to the discussion. I believe I was upset and went home early. The next day when I came to work, all of the company files had been cleaned out and Neil was gone.

At about the same time, Neil encouraged family members to pull their money out of the firm, creating a crisis with the banks and resulting in Dave having to sign personal notes to guarantee certain loans. At one point Neil sent a letter to Dave stating that he had

written a number of nasty notes in the past to the managers . . . , so this is certainly not out of the ordinary from what I normally do. . . . Our bad debts are disastrous. . . . It's your own damn fault.

find that the facts support the trial court's conclusion that Dave did not engage in oppressive actions toward Neil as a minority shareholder.

Washington cases have not addressed the question of what constitutes "oppressive" action against a shareholder. A number of courts in other states have found oppression in minority shareholder settings. The court in *Gimpel v. Bolstein*, 125 Misc. 2d 45, 477 N.Y.S.2d 1014 (1984) attempted to set a standard for determining the existence of oppression, stating that "[t]he most prominent [definition of oppression] stems from the writings of F. Hodge O'Neal, [which define] 'oppression' as a violation by the majority of the 'reasonable expectations' of the [minority]." *Gimpel*, 125 Misc. 2d at 50. "Reasonable expectations" are those spoken and unspoken understandings on which the founders of a venture rely when commencing the venture. *Gimpel*, at 51.

The court in *Gimpel* did not use the reasonable expectations test because the corporation was 53 years old, the current shareholders were not the original shareholders, and the plaintiff had stolen from the corporation, thereby breaking all bargains. The court thus applied a secondary definition, describing oppression as

> burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.

(Citations omitted.) *Gimpel*, at 50-51 (quoting *Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 628-29, 507 P.2d 387 (1973)).

Under either of these tests, the factual findings support the legal conclusion that Dave did not oppress Neil as a minority shareholder. Neil's removal from SRI was anticipated by the letter of intent in which Dave was to control SRI and Neil RA. To the extent that Dave's actions were burdensome and violated fair play, Neil had the power to (and did) reciprocate in kind through his control of RA, by,

among other things, failing to make payments and thus compromising SRI's financial position. Had Neil cooperated by making payments, Dave may have stopped his "oppression" by paying rent. We thus conclude that Neil was not oppressed as a minority shareholder.

The next inquiry is whether a fair market discount should not apply because Neil was a dissenting shareholder (or *like* a dissenting shareholder). RCW 23B.13.020(1) states that a shareholder is entitled to dissent from, and obtain payment of the "fair value" of his or her shares if certain corporate actions occur, none of which are relevant here. Neil does not contend the statute applies, only that he should receive the same "fair value" as would a dissenting shareholder. The trial court concluded that a "dissenter shareholder situation is closer to what we have than is a minority squeeze out or voluntary sale to a third part[y]."

The court's analogy in its memorandum opinion to a dissenting shareholder finds support in the facts. Neil's interest in the corporation, as a result of the letter of intent, was diminished, as is often claimed by dissenting minority shareholders. The rancor between Neil and Dave had reached such a pitch that Neil could not agree on many corporate actions, including, of course, Dave's decision to withhold rent from RA. And most importantly, just as with a dissenting shareholder where the sale of stock is to the corporation, here the sale was to the functional equivalent of the corporation, that is, to Dave, the majority shareholder who controlled the corporation. No third party was involved.

The dissenter shareholder statute provides for "fair value" payment, not "fair market value". "Fair value" is defined in the statute as the value of the shares immediately before the effective date of the corporate action to which the dissenter objects. RCW 23B.13.010(3). What is meant by the "value" of the shares in the statute is unclear, and has been for some time.[3] In applying the Washington dissenter's appraisal

---

[3] As stated in *In re Northwest Greyhound Lines*, 41 Wn.2d 672, 678, 251 P.2d 607 (1952):

"Our problem is to determine what the word 'value' connotes. Some statutes and some decided cases employ the phrase 'fair value'; others refer to 'intrinsic

statute, Washington courts have not applied a minority discount, but then, in the only two cases involved, the majority shareholder did not raise the issue. *See In re West Waterway Lumber Co.*, 59 Wn.2d 310, 367 P.2d 807 (1962); *In re Northwest Greyhound Lines*, 41 Wn.2d 672, 251 P.2d 607 (1952).

It is important to note that a minority discount is different from a marketability discount. Marketability discounts are applied to all the stock of a corporation that is not widely traded, whereas minority fair market value discounts only apply to minority shareholders. The valuation of SRI already took into account a marketability discount; the minority discount applied by the court was additional.

Courts in other states have noted the unfairness of discounting minority shares where the sale is to other shareholders. In *Columbia Mgt. Co. v. Wyss*, 94 Or. App. 195, 765 P.2d 207 (1988), after reviewing a number of other state's cases, the court held that it was error to apply both a minority discount and a marketability discount to shares owned by a dissenting shareholder. The court rejected the minority discount as inappropriate to an "internal transaction", because market recognition of a minority discount has little validity when the corporation or someone already in control of the corporation is the purchaser. The court concluded one could not then say that the shares are worth less because they were noncontrolling. *Columbia Management*, at 206. "To include a minority discount would simply penalize [the minority shareholder] while allowing the corporation to buy his shares cheaply." *Columbia Management*, at 206. The court stated:

> [E]xcept in a few jurisdictions, such as Indiana . . . , "fair value" does *not* mean "fair market value." Market value is, at most, one factor in determining fair value. Courts have adjusted market value to reflect other factors, even when the corporation in question is traded on a national securities exchange. *See, e.g., In Re Valuation of Common Stock of Libby, Etc.*, 406 A2d 54 (Me.1979).

value'; still further terminology is used, such as 'market value,' 'fair market value,' 'true value,' 'investment value,' 'nuisance value,' 'going concern value,' 'liquidation value,' 'earnings value,' and 'actual value.' "

. . . .

The minority discount . . . recognizes that controlling shares are worth more in the market than are noncontrolling shares. . . . [B]ecause the purchaser of the shares will be the corporation, not an outsider, this recognition of decreased market value may not be appropriate. . . . A leading authority on business valuation states that discounts of any sort are questionable in a dissenter's rights case:

"[T]here is less reason to discount the intrinsic value of stock in a dissenting shareholder valuation than in other types of transactions . . . *The purpose of applying these discount variables is to determine the investment value or fair market value of a minority interest in the context of a hypothetical sale between a willing seller and buyer, a situation that does not exist in the dissenting shareholder situation.*" Haynsworth, *Valuation of Business Interests*, 33 Mercer L Rev 457, 459 (1982). (Emphasis supplied.)

*Columbia Management*, at 202-04.

Similarly, *MT Properties, Inc. v. CMC Real Estate Corp.*, 481 N.W.2d 383 (Minn. Ct. App. 1992) involved the value of a dissenting shareholder's shares. The trial court had applied a 22 percent discount as a " 'minority and marketability' " discount. *MT Properties*, at 386. The record revealed that the discount was designed solely to reflect CMC's minority status. The court held it contrary to the purpose of the statute protecting dissenting shareholders to apply a minority discount, because it would allow the majority to force out the minority shareholder without paying the fair share of the value for the enterprise. *MT Properties*, at 387-88.

In a slightly different context, the court in *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989) stated:

Where there is no objective market data available, the appraisal process is not intended to reconstruct a *pro forma* sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. . . . [T]o fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*See also In re McLoon Oil Co.*, 565 A.2d 997, 1003 (Me. 1989) (minority discounts run counter to protecting dissenting shareholders); *Brown v. Allied Corrugated Box Co.*, 91 Cal.

App. 3d 477, 154 Cal. Rptr. 170 (1979) (when a corporation elects to buy out the shares of a dissenting shareholder, the fact that the shares are noncontrolling is irrelevant to their value).

Here, had the value of Neil's shares to a third party been at stake, it would have been appropriate for the trial court to apply a minority discount to approximate the fair market value. We do not doubt the experts' opinions that the market value of Neil's minority shares is less per share than that of Dave's majority shares. But, as in a dissenting shareholder situation, here no third party was involved, and thus there was no "market" in fact or in theory — Dave was the only party contemplated to buy the stock.

The court recognized the extra value that Neil's stock would have for Dave: "Dave's ownership will go to almost 80% and he will be ridding himself of a minority shareholder who had become, and would continue to be, extremely difficult." This, though, is one of the very reasons a minority shareholder's stock should not be discounted to fair market value, because the value to Dave is different from what it would be in the market.[4]

Where no market was involved in valuing Neil's shares, and Dave had strong incentive to buy them, we find no justification in these facts for the application of a fair market value minority discount. We therefore remand to the trial court to remove the discount.

### PREJUDGMENT INTEREST

Neil contends the trial court erred by calculating interest on the balance rather than on the entire claim. Dave argues that the interest and offset issues are governed by the agreements which call for contemporaneous offset.

The September 28 agreement did not specify a method for computing interest. Neil contends that two methods are at

---

[4]Had Dave only owned less than 50 percent of the stock, he might have been willing to pay a *premium* for Neil's 29 percent, because Dave would then own a majority of the stock. Generally, to the majority, any stock above 50 percent has the same value.

issue here, the "interest on the balance" rule and the "interest on the entire claim" method.[5]

Here, as to the promissory notes, we note that interest was a contractual right unaffected by either of these methods, both of which are concerned with interest on a claim for damages rather than interest due on a note which specifies interest. Discussion of these methods is appropriate, however, because of RA's claim for rental offset against SRI's claims.

Neil cites *Mall Tool Co. v. Far West Equip. Co.*, 45 Wn.2d 158, 177, 273 P.2d 652 (1954), contending that the court should have applied interest on the entire claim. In *Mall Tool*, a manufacturer brought suit on an open account for goods sold and delivered. The distributor cross-complained for damages for the violation of an exclusive dealership contract. The court held that the manufacturer (Mall Tool) was entitled to interest on the account notwithstanding the distributor's cross claim, that is, to interest on the entire claim:

> An unliquidated counterclaim, even when established, does not affect the right to interest prior to judgment on the amount found to be due on a liquidated or determinable claim, since the debtor may not defeat the creditor's right to interest on such a claim by setting up an unliquidated claim as a set-off. *Hansen v. Covell*, 218 Cal. 622, 24 P. (2d) 772, 89 A. L. R. 670

---

[5] Am. Jur. summarizes the two rules as follows:

"(1) *The 'interest on the balance' rule*. . . . This rule should be applied when a deduction is claimed for defective workmanship or is of such a character as to constitute payment to the plaintiff. The theory behind this rule is that the plaintiff was only deprived of the use of this amount of money during the pendency of the litigation, and is entitled to interest only on [the balance].

"(2) *The 'interest on the entire claim' method*. In a limited number of cases, interest is allowed on plaintiff's entire claim [*i.e.*, including interest], and the defendant's demand is treated as a deduction from the total amount awarded to the plaintiff. This rule is applicable in cases where the claim for deduction cannot be said to have been demandable at the time when the original liquidated claim became due, and is the proper subject of a counterclaim for damages rather than of an offset in the nature of a payment."

(Footnotes omitted.) 22 Am. Jur. 2d *Damages* § 660 (1988).

(1933). (If the counterclaim or set-off be liquidated or deter-minable, such claim could bear interest in its own right from the time it or the various items which comprise it become due and payable.)

*Mall Tool*, at 177. The case did not involve interest-bearing notes.

Neil contends the claims and counterclaims involved here are all liquidated, and should bear interest in their own right, that is, as interest in the entire claim, as stated in *Mall Tool's* parenthetical quoted above. However, *Mall Tool* suggests that liquidated counterclaims *could* bear interest in their own right, not that they must, or even should. Further-more, *Mall Tool* is distinguishable from the case at hand because one of the claims in *Mall Tool* was an unliquidated damage claim, whereas here both claims are liquidated.

■ We believe the "interest on the balance" method is the more appropriate rule in this case. SRI and RA, though controlled separately by the two brothers, were financially dependent on each other: SRI owed rent to RA on five properties, and RA owed SRI for two loans and money borrowed from third parties which were secured by SRI and Dave. One party's default caused the other party to default, thus, in effect constituting contemporaneous cross pay-ments. As the court in *Hansen v. Covell*, 218 Cal. 622, 630, 24 P.2d 772, 89 A.L.R. 670 (1933) put it, "the deduction . . . constitute[d] payment", that is, Neil's deduction of payments to Dave constituted Dave's payments to Neil. The method used by the trial court more accurately reflected what would have occurred had the parties complied with the contracts and made their payments. Accordingly, we find that the trial court did not err in calculating the interest.

ATTORNEY'S FEES

Neil contends that RA was the prevailing party in the rent case, and is entitled as a matter of law to attorney's fees. Neil's argument presumes that the rent action is separate from Dave's other complaints against Neil. This

argument fails because the claims of each party were consolidated into one trial and were intimately related. Dave failed to pay SRI's rent at the same time as, and because of, Neil's failure to pay RA's obligations to SRI. Each party was exercising rights pursuant to the letter of intent — payment for rent on the one hand, servicing loan debt on the other. There is substantial support in the record for the trial court's finding that neither party prevailed, and we find the court did not err in failing to award attorney's fees.

This case is remanded to eliminate the fair market value discount for Neil's minority shares, and, in all other respects, is affirmed.

GROSSE, C.J., and FORREST, J., concur.