[No. 47795-1-I.   Division One.   August 5, 2002.]

MATTHEW G. NORTON COMPANY, *Appellant*, v. THEODORE H. SMYTH, *as Trustee*, ET AL., *Respondents*.

*Michael J. Layton*; *Joseph C. Bowen*; and *Paul E. Brain* (of *Mikkelborg, Broz, Wells & Fryer*), for appellant.

*Fredric C. Tausend* and *Marc C. Levy* (of *Preston Gates & Ellis, L.L.P.*), for respondents.

KENNEDY, J. — Under Washington's Business Corporation Act, shareholders are entitled to dissent from certain proposed corporate actions, including mergers, and demand that the corporation pay "fair value" for the shares if the proposed action is effectuated. In a case of first impression in Washington, the trial court ruled as a matter of law that Matthew G. Norton Company could not apply a lack of marketability discount and a discount for future taxation of embedded capital gains in determining "fair value" of the dissenters' shares in the companies that merged. Insofar as the trial court's ruling was intended to provide a bright-line rule that such discounts are never appropriate in dissenters' rights actions, *even at the corporate level*, we reverse. But by doing so, we do not imply that the Company is necessarily entitled to either of the discounts as a matter of law in this case. Indeed, we affirm the trial court's denial of summary judgment to the company on that issue, and to the extent that the trial court's ruling was intended, absent extraordinary circumstances, to disallow any such discounting *at the shareholder level*, we also affirm.

Following remand, the trial court must ascertain the exact nature of the merging companies as operating enterprises on the valuation date, and hear expert testimony on the specific question of the acceptability, *for purposes of*

*appraisal under the dissenters' rights statute*, of the appraisal techniques that each party proposes to employ, as opposed to appraisal techniques for other purposes that might not be relevant in this setting. Once the trial court determines the value of each of the merging corporations as going concerns, the dissenting shareholders are entitled to receive the "fair value" of their proportionate interests in the going concerns at the time of the merger, without any discounting at the shareholder level.

## FACTS

Matthew G. Norton Company (MGN) was formed in 1979 to consolidate the real estate and securities investments of the Norton Clapp family. It was a privately held holding company that held and managed a portfolio of commercial real estate, investments in certain private companies and venture capital funds, and a diversified portfolio of marketable stocks. Northwest Building Corporation (NWBC) was founded in 1936. In 1979, when MGN was formed, the real estate assets of the Norton Clapp family were transferred to a subsidiary that was merged into the preexisting NWBC.

In early 1999, the Boards of Directors of MGN and NWBC proposed a corporate reorganization under which MGN would be merged into NWBC, and the corporate status of the resulting merged company would be changed for federal income tax purposes from a "C" corporation to a Subchapter S corporation. Each MGN shareholder would exchange his or her respective shares of MGN stock for the same number of shares of NWBC stock, and the shareholders' respective stakes in the merged entity would be the same as before, that is, each MGN shareholder would have the same stake in NWBC as he or she had previously held in MGN, and each shareholder of NWBC would retain the same stake in NWBC as previously held. The name of the reorganized company would then be changed to Matthew G. Norton Company.

MGN and NWBC provided written notice of the proposal to their respective shareholders. These notices set the dates

for the shareholders' meetings at which the proposal would be voted upon, and provided that the reorganization would not take place absent 85 percent shareholder approval—the Boards of Directors having previously determined that the proposed reorganization would not be economical if it were necessary to buy out more than 15 percent of the outstanding shares of the corporations from any dissenting shareholders. Each of the notices stated that the proposed action would create dissenters' rights under chapter 23B.13 RCW—that chapter of Washington's Business Corporation Act that deals with dissenters' rights.

At the time of the proposal, MGN had 43 individual shareholders, all of them related in some way to Matthew G. Norton. None of the shareholders held a majority interest in MGN. The average ownership interest of all the shareholders of MGN was approximately three percent. Stephen G. Clapp, who is one of the respondents to this appeal, was the only shareholder of MGN to dissent to the proposal. He held 25,016 shares of stock in MGN, 3.1 percent of the outstanding shares. At the time of the proposal, NWBC had only two shareholders, MGN and Theodore H. Smyth as Trustee of the Elizabeth M. Smyth 1987 Revocable Trust (Smyth). MGN owned 99.65 percent of the outstanding stock of NWBC. Smyth owned the remainder, which amounted to 142 shares. Smyth, who is the other respondent to this appeal, also dissented.

Mssrs. Clapp and Smyth, utilizing the procedures required of dissenting shareholders under chapter 23B.13 RCW, provided notice of their intent to dissent and to vote their respective shares against the proposal, and demanded payment for their respective shares if the shareholders approved the proposed action. In due course, all the other shareholders of each corporation did approve the action. At the shareholders' meeting held on February 26, 1999, 96.9 percent of MGN's shares were voted in favor of the reorganization, and at the shareholders' meeting held on March 10, 1999, 99.65 percent of NWBC's shares were voted in favor of the reorganization. Matthew G. Norton Company was formed and became the petitioner in this action.

Matthew G. Norton Company hired the accounting firm of Arthur Andersen to conduct valuations of MGN and NWBC for purposes of determining "fair value" of the dissenters' shares in these "C" corporations as of the date of the merger. Arthur Andersen employed a "net asset" valuation method, which, in the simplest of terms, involved the adjustment of each company's balance sheet to reflect current market values of assets and liabilities as of the valuation date.

In determining the market value of certain corporate assets for purposes of such balance sheet adjustment, Arthur Andersen drew from the market approach and the cost approach through a review of prices paid for limited partnership interests and their underlying net asset values. Arthur Andersen did not directly use the income approach, but utilized corporate management's valuation of certain assets that were calculated using a discounted cash flow model. Where the corporation owned less than a controlling share of a particular corporate asset, Arthur Andersen applied a minority discount factor to reflect lack of controlling interest and marketability of the corporation's interest in that particular asset.

In adjusting liabilities, Arthur Andersen raised MGN's deferred taxes from a book value of $9.008 million to $44.258 million, and raised NWBC's deferred taxes from a book value of $5.744 million to $36.983 million, "to recognize the net appreciation of asset values to fair market value." Clerk's Papers at 340.

All of this indicated a net asset value of $170.246 million for MGN and $99.446 million for NWBC.

Then, Arthur Andersen adjusted the net asset value of each company to reflect lack of marketability of the shares in the companies, based on market evidence of transactions involving thinly traded holding companies that Arthur Andersen deemed to be similar to MGN and NWBC, that indicated such companies are priced below their net asset values. For this analysis, Arthur Andersen looked at studies of real estate limited partnerships, equity limited partner-

ships, closed-end investment companies and pre-IPOs (initial public offering), and compared such factors as ownership risk, cash distributions, debt, historical profits, term of agreement, ability to sell interest, and control of management with those same factors at MGN and NWBC.

In its valuation report for MGN, Arthur Andersen noted that the shareholders are severely restricted in their ability to transfer or sell their shares. Under the Shareholder Agreement of that company, shareholders wishing to sell their stock must first offer the shares to the lineal descendants of Matthew G. Norton at a price to be determined by the Board of Directors. Any unsold shares must next be offered to MGN for redemption at the price set by the Board. The maximum redemption for all shareholders in a given year is $1 million, and the company has the right to pay annual installments of $250,000, together with interest at six percent annually on the balance. Only if the company is unable to redeem the shares may the seller then offer them to any third-party purchaser. Although there are no such restrictions of the transfer of stock in NWBC, there is no public market for the stock in either corporation. Based on these and other factors affecting liquidity, Arthur Andersen opined that it was appropriate to discount the net adjusted value of MGN by 35 percent and to discount the net adjusted value of NWBC by 40 percent. This discount had the stated purpose of reflecting the lack of marketability of each and every share in the company, and not the minority status of the shares of the dissenting shareholders.[1]

---

[1] The expert retained by Mssrs. Clapp and Smyth, Robert Duffy, declined to offer a legal opinion on the ultimate issue of the propriety of applying discounts for lack of marketability and built-in capital gains in dissenters' rights valuations, but did opine that if such discounts are appropriate, (1) Arthur Andersen did not utilize methodology for computing lack of marketability discounts that is generally accepted in the financial community for purposes of determining "fair value" and (2) discovery had not progressed sufficiently to allow a determination of present value of future tax impacts as of the valuation date. Mssrs. Clapp and Smyth state in their brief that Arthur Andersen's tax adjustments assume liquidation of assets of the corporations as of the valuation date. MGN does not dispute this in its reply brief.

Arthur Andersen concluded that as of March 31, 1999, the value of one share of MGN was $138 and that the value of one share of NWBC was $1,451.

As is contemplated by RCW 23B.13.250, MGN paid Mr. Clapp $3,509,146 (including accrued interest) for his shares in MGN, and paid Mr. Smyth $208,050 (including accrued interest) for the shares of NWBC belonging to the trust.

Mssrs. Clapp and Smyth notified the Company that they were dissatisfied with these amounts. As permitted by RCW 23B.13.280, Clapp demanded a total amount of $6,858,928 for his shares and Smyth demanded a total amount of $458,864 for the shares belonging to the trust.

MGN, being unwilling to pay the dissenting shareholders any more money, filed its Petition for Determination of Fair Value of Shares of Dissenting Shareholder, pursuant to RCW 23B.13.300. In due course, Mssrs. Clapp and Smyth filed a motion for (partial) summary judgment, asking the court to rule that neither the lack of marketability discount nor built-in gains discount "is available in a dissenter's rights valuation as a matter of law." Clerk's Papers at 166. In response, MGN cross-moved for (partial) summary judgment asking the court to rule that "both of these discounts are appropriate in this case, as a matter of law." Clerk's Papers at 422. The trial court granted the motion of Mssrs. Clapp and Smyth and denied the motion of MGN.

The "fair value" of the shares of the dissenting shareholders has not yet been determined by the trial court. The trial court entered final judgment on the above-described legal rulings pursuant to CR 54(b), and MGN filed this appeal. A commissioner of this court reviewed the trial court's CR 54(b) findings and ruled the matter appealable. We review questions of law de novo. *State v. McCormack*, 117 Wn.2d 141, 143, 812 P.2d 483 (1991).

## DISCUSSION

At common law, unanimous shareholder approval was required in order to undertake major corporate actions. *Voeller v. Neilston Warehouse Co.*, 311 U.S. 531, 536 n.6, 61 S. Ct. 376, 85 L. Ed. 322 (1941). This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusing to cooperate. *Id.* To resolve this problem, state legislatures, such as Washington's, authorized corporate action by majority vote. To avoid unfair treatment of shareholders, legislatures granted dissenting shareholders the right to obtain "fair value" for their shares. *Id. See* ch. 23B.13 RCW.[2]

■ "Fair value" is defined for purposes of the dissenters' rights statute as "the value of the shares immediately before the effective date of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless such exclusion would be inequitable." RCW 23B.13.010(3). The term "value" is inherently ambiguous. *N.W. Greyhound Lines v. McCornack*, 41 Wn.2d 672, 678, 251 P.2d 607 (1952). It is clear, however, that our legislature's use of the term "fair value" was not a slip of the pen—the legislature did not intend to say "fair market value" instead. *Robblee v. Robblee*, 68 Wn. App. 69, 77, 841 P.2d 1289 (1992) ("dissenter shareholder statute provides for 'fair value' payment, not 'fair market value' "). All of the states and the District of Columbia have dissenters' rights statutes. Forty-six states use the "fair value" standard, or one of its iterations, exclusively. Only four states, California ("fair market value"), Louisiana ("fair cash value"), Ohio ("fair cash value") and Kansas ("value") use another term. The

---

[2] Title 23B RCW is Washington's enactment of the Revised Model Business Corporation Act. 2 SENATE JOURNAL, 51st Leg., app. A at 2983 (Wash. 1989).

District of Columbia statute contains both "fair value" and "fair market value."[3]

The statutory definition of "fair value" leaves to the parties, and ultimately the courts, the details by which fair value is to be determined, and leaves intact accumulated case law regarding market value, value based on prior sales, capitalized earnings value and asset value. Proof of value may be made by any techniques or methods that are generally acceptable in the financial community. Official Comment to RCW 23B.13.020, *reprinted in* 2 Senate Journal, 51st Leg., app. A at 3086 (Wash. 1989) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983)).[4] Determining fair value requires consideration of all relevant factors involving the value of a company, and may include elements of future value, excluding, however, the speculative elements of value that may arise from accomplishment or expectation of the transaction giving rise to the dissenters' rights. *Weinberger*, 457 A.2d at 713. *Accord N.W. Greyhound Lines*, 41 Wn.2d at 680.

### Lack of Marketability Discount

■ When Washington adopted its version of the Model Business Corporation Act in 1989, the Model Act was silent as to the propriety of discounts in determining "fair value." In 1999, the Model Act was amended to redefine "fair value" as follows:

"Fair value" means the value of the corporation's shares determined:
  (i) immediately before the effectuation of the corporate action to which the shareholder objects;

---

[3] John D. Emory, Jr., *The Role of Discounts in Determining "Fair Value" Under Wisconsin's Dissenters' Rights Statutes: The Case for Discounts*, 1995 Wis. L. Rev. 1155, 1164 n.50 (1995).

[4] The Official Comments to the Washington statute were prepared by the Corporate Act Committee of the Washington State Bar Association, and are adapted from the Official Comments that accompanied the version of the Model Business Corporation Act that existed in 1989. Both the Model Act and the Official Comments to the Act were revised substantially in 1999. Our legislature has not adopted the amendments as of this time.

   (ii)  using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and

   (iii)  without discounting for lack of marketability or minority status[.]

ABA, MODEL BUSINESS CORPORATION ACT ANNOTATED (1999). We are unaware whether any state has amended its dissenters' rights statute to incorporate this specific definition of "fair value." Nevertheless, a number of courts had already rejected lack of marketability discounts before the Model Act was revised, and, for that matter, before Washington adopted its version of the Model Act. A number of states have rejected such discounts since the revisions to the Model Act, without benefit of amendments to their statutes. The Official Comments to the Washington statute, which are based on the Official Comments to the Model Act, reflect that the legislature intended to leave such details to the courts, when it left intact the body of case law by which these concepts were developing. As we shall see, neither the case law nor the valuation techniques that are generally acceptable in the financial community have remained static since Washington adopted its version of the Model Act. Indeed, in *Weinberger*, which is explicitly cited in the Comments, the court overruled previous Delaware case law that had established an exclusive methodology to be applied in dissenting shareholder proceedings, and held instead that value may be proved "by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Weinberger*, 457 A.2d at 713. We conclude that the fact that our legislature has not amended chapter 23B.13 RCW to conform to the most recent revisions to the Model Act does not preclude the courts of this state from disapproving such discounts as may be inappropriate in ascertaining "fair value."

As noted by the *Weinberger* court:

"The basic concept of value under [Delaware's dissenters' rights statute] is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock [that] has been taken by the merger."

*Weinberger*, 457 A.2d at 713 (quoting *Tri-Continental Corp. v. Battye*, 31 Del. Ch. 523, 74 A.2d 71, 72 (Del. 1950)). And in *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144-45 (Del. 1989), the court held that a minority shareholder in fair value cases is entitled to a proportionate interest in the corporation appraised as an entity and rejected application of a marketability discount, reasoning that such a discount is contrary to the requirement that the company be valued as a going concern.

In *Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 491-94 (8th Cir.), *cert. denied*, 534 U.S. 887 (2001), the court reviewed decisions from Missouri, New Jersey, Delaware, Maine, South Dakota, Oregon and Kansas wherein the courts rejected lack of marketability discounts, either under bright-line rules such as that adopted by the trial court in this case, or allowing them only as an exception under extraordinary circumstances. Based on the reasoning of those courts, the *Swope* court concluded:

The marketability discount is incompatible with the purpose of the appraisal right, which provides dissenting shareholders with a forum for recapturing their complete investment in the corporation after they are unwillingly subjected to substantial corporate changes beyond their control. . . .

. . . .

We conclude that the market for minority stock in a dissenting shareholders' appraisal proceeding, absent extraordinary circumstances, is not a relevant fact or circumstance to consider when determining fair value.

*Swope*, 243 F.3d at 493-94.

As noted by this court in *Robblee*, 68 Wn. App. at 77, our statute provides for "fair value" not "fair market value." The

*Swope* court agreed: " '[F]air value' in minority stock appraisal . . . is not equivalent to 'fair market value.' Dissenting shareholders, by nature, do not replicate the willing and ready [sellers] of the open market. Rather, they are unwilling sellers with no bargaining power." *Swope*, 243 F.3d at 492-93 (citing Harry J. Haynsworth IV, *Valuation of Business Interests*, 33 MERCER L. REV. 457, 459 (1982); Joseph W. Anthony & Karlyn V. Boraas, *Betrayed, Belittled . . . But Triumphant: Claims of Shareholders in Closely Held Corporations*, 22 WM. MITCHELL L. REV. 1173, 1186 (1996); and Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 DUKE L.J. 613, 636-37 (1998)).

As the *Swope* court also noted, the American Law Institute concludes that the proper interpretation of "fair value" is the proportionate share of the value of 100 percent of the equity in the company, without any discount for minority status, or, absent extraordinary circumstances, lack of marketability. *See* 2 AM. LAW INST., PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.22(a) (Standards for Determining Fair Value) & cmt. e, at 324 (1994). *See also* AM. SOC'Y OF APPRAISERS, BUSINESS VALUATION, SELECTED ADVANCED TOPICS, MODEL 2.5 DISSENTING SHAREHOLDER ACTIONS AND FAIR VALUE (1997), in which the Society declared a trend towards "defining fair value as a pro-rata share of the value of 100 percent of the equity." *Swope*, 243 F.3d at 492.

Nevertheless, some states having dissenters' rights statutes defining "fair value" identically to our own statute permit lack of marketability discounts, at least at the corporate level. *E.g.*, *Tri-Continental Corp.*, 74 A.2d at 76 (recognizing that the *full* value of the corporation's assets is not the same as the value of those assets to the common shareholder because discount is an element of value that must be given independent effect in the valuing of the common stock of regulated closed-end investment companies). *But see Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549 (Del. 2000) (explaining that *Tri-Continental* was an

acknowledgement that the court had authority to make a discount of the corporation's fair asset value *at the corporate level* because it constituted a proper application of an accepted methodology for arriving at the proper valuation of a unique corporate enterprise, i.e., a regulated closed-end investment company with leverage that was engaged in investing in a cross section of the stock market; holding that once entire corporation has been valued as an operating entity, however, dissenting shareholder entitled to proportionate interest in entire going concern, without discount at the shareholder level).

Even those courts that generally will not apply such a discount do not support a blanket rule that, "as a matter of law," a marketability discount should *never* be considered. *See Swope*, 243 F.3d at 494 (lack of marketability of shares not a relevant fact absent extraordinary circumstances); *Atl. States Constr., Inc. v. Beavers*, 169 Ga. App. 584, 314 S.E.2d 245 (1984) (marketability of stock may be a factor in determining fair value); *Weigel Broad. Co. v. Smith*, 289 Ill. App. 3d 602, 682 N.E.2d 745, 751, 225 Ill. Dec. 1 (1996) (trial court was justified in finding that illiquidity of company had a significant bearing on the intrinsic value of the stock, especially in the absence of any claim of oppressive corporate conduct); *Ford v. Courier-Journal Job Printing Co.*, 639 S.W.2d 553 (Ky. Ct. App. 1982) (affirming application of 25 percent lack of marketability discount to net asset value of closely held company); *Advanced Communication Design, Inc. v. Follett*, 615 N.W.2d 285 (Minn. 2000) (establishing a bright-line rule foreclosing consideration of discount would be inconsistent with the legislative policy of flexibility and fairness to all parties and could hamper the courts' ability to take into account circumstances that might lead to an unfair wealth transfer); *Lawson Mardon Wheaton, Inc. v. Smith*, 160 N.J. 383, 734 A.2d 738, 749 (1999) ("there may be situations where equity compels another result"); *Balsamides v. Protameen Chems., Inc.*, 160 N.J. 352, 734 A.2d 721 (1999) (upholding discount where the illiquid nature of the corporation's shares impacted

value of the corporation as a whole). *But see Morrow v. Martschink*, 922 F. Supp. 1093 (D.S.C. 1995) (a lack of marketability discount is especially inapplicable to an intrafamily transfer in a closely held company).

■ ■ We are unable to fully reconcile the conflicting cases from around the country that the parties cite as persuasive authority for their respective positions regarding lack of marketability discounts. Nevertheless, it is our task to establish guidelines for courts, litigants and appraisers in Washington that deal with our dissenters' rights statute. We conclude that the most logical starting place is to determine what it is that needs to be measured. As stated by the American Law Institute in its treatise on corporate governance:

> A focus on measurement technique is . . . meaningless absent agreement on what is to be measured. This is essentially a definitional problem, and it involves significant normative issues that cannot be resolved simply by reference to the "customary valuation concepts" then in use in the relevant market.
>
> . . . .
>
> Some recent decisions have used a "willing buyer-willing seller" standard (*see Armstrong v. Marathon Oil. Co.*, 32 Ohio St.3d 397, 513 N.E.2d 776, 785-86 (1987)), but have focused this test on the value of the specific shares held by the dissenting shareholder. In contrast, § 7.22(a) focuses on what a buyer would pay for the firm as an entirety (or, in the case of a sale of corporate assets covered by § 7.22(c), on what such a buyer would pay for the transferred assets, with the court then also valuing the remaining unsold corporate assets). In focusing on the value of the firm, rather than the value of specific shares, § 7.22(a) thus adopts the principle, long recognized by the Delaware courts, and more recently by the New York courts, that the appraisal remedy should award each shareholder a proportionate share of the firm's value. *See Tri-Continental Corp. v. Battye*, 31 Del.Ch. 523, 74 A.2d 71, 72 (1950) (shareholder entitled to "proportionate interest" in firm's aggregate value); *In the matter of Cawley v. SCM Corp.*, 72 N.Y.S.2d 465, 534 N.Y.S.2d 344, 530 N.E.2d 1264 (1988)

(same). As a result, once an aggregate value for the firm is obtained, the court under § 7.22(a) normally has only to prorate this value equally among all shares of the same class.

2 PRINCIPLES OF CORPORATE GOVERNANCE, *supra*, § 7.22, at 319-22.

We agree. A buyer purchasing MGN or NWBC in its entirety, or purchasing certain of its assets, would likely require a discount to reflect such company's lack of a controlling interest or lack of marketability of certain of its holdings. Thus, such discounts may very well be appropriate, at the corporate level, with respect to the value of particular corporate assets. As we have noted, Arthur Andersen did apply such discounts with respect to certain of the corporate assets. At the corporate level, the willing buyer-willing seller standard for determining "fair market value" of the various corporate assets is certainly appropriate.

But our legislature did not adopt "fair market value" as the standard in granting dissenters' rights to shareholders for the "fair value" of their shares. The Arthur Andersen valuation reports for MGN and NWBC inappropriately equate "fair value" of the shares with "fair market value"— that being the very purpose for which lack of marketability discounts (as well as minority discounts) are applied, after all.[5]

---

[5] In most states, including Washington, the dissenters' rights statute applies to both publicly held and privately held corporations. In the words of one commentator: "It is particularly important that courts determining fair value in appraisal proceedings be aware of the purposes now served by the remedy. Courts should be willing to entertain all relevant evidence bearing on the fair value of the corporation. They should not place undue reliance on market prices, and should not permit minority or 'lack of marketability' discounts. If a corporation's value is derived by reference to a per share market price, the value should be adjusted upward to remove the inherent minority discount embodied in market prices. When available, evidence as to the price an unaffiliated third party would be willing to pay for the corporation as a whole should be particularly probative in the appraisal context." Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 DUKE L.J. 613, 618 (1998).

Some courts, including our own, have been careful to distinguish minority discounts from lack of marketability discounts. *See Robblee*, 68 Wn. App. at 78 ("Marketability discounts are applied to all the stock of a corporation that is not widely traded, whereas minority fair market value discounts only apply to

The trial court's order may (or may not) have been intended to preclude the minority and lack of marketability discounts that Arthur Andersen applied at the corporate level in adjusting the book value of certain of the assets of the corporations to determine their fair market value. To the extent that the order was so intended, we reverse. And to the extent that the trial court may have intended to preclude the possibility of any lack of marketability discount at the shareholder level even in the face of extraordinary circumstances, if any there may be in this case, we also reverse. But to the extent that the trial court's order was intended to declare that, absent extraordinary circumstances, no such discount can be applied at the shareholder level, we affirm.

The parties have not had the opportunity to brief the extraordinary circumstances exception, and should be given opportunity to do so, following our remand, if either side believes any such circumstances to be applicable in this case.

## Discount for Built-In Capital Gains

In calculating net asset value, Arthur Andersen adjusted the balance sheets of MGN and NWBC to reflect future capital gains tax liabilities that are embedded in appreciated assets that the corporations own. It is not immediately apparent to us just how Arthur Andersen computed the taxation discount. Mssrs. Clapp and Smyth claim in their brief that Arthur Andersen computed the discount by assuming liquidation of all the corporations' appreciated assets as of the date of merger. MGN does not refute this claim in its reply brief. The record does not reflect whether sale of any of the assets of MGN or NWBC was contemplated at the time of the merger. At the time of the summary judgment, discovery had not yet progressed to

minority shareholders."). While this is true, in the context of dissenters' rights appraisals the two types of discounts serve the same purpose—to establish a theoretical market value for shares that are not publicly traded. Where shares are publicly traded, the market price already embodies minority discounts.

the point that the appraiser for the dissenting shareholders could examine the historical pattern of disposition of assets, any plans relating to holding periods, and use of tax mitigation strategies by the companies. The parties have not briefed the question of how the dissenting shareholders will be taxed on the proceeds of the buyout, although Mssrs. Clapp and Smyth contend that it is reasonable to assume that they will pay capital gains taxes on the appreciation of their shares. If this is so, the dissenters may be paying their proportionate shares of the appreciated value of the corporate assets directly. They should not be required to pay twice. All of these unanswered questions became moot, of course, with the trial court's ruling.

The trial court ruled as a matter of law that the adjustments for built-in capital gains are not appropriate in a dissenters' rights appraisal. Matthew G. Norton Company argues that this was error because taxes on those gains are a certainty and apply in liquidating and nonliquidating scenarios. The Company relies upon *Eisenberg v. Comm'r of Internal Revenue*, 155 F.3d 50, 55 (2d Cir. 1998) and sections of the tax code cited therein for the proposition that it is entitled to the discount because the taxes are not speculative.

*Eisenberg* is not helpful. There, the appellant Irene Eisenberg owned all 1,000 shares of the outstanding common stock, a "C" corporation that owned an apartment building in New York City. The corporation had no plans to liquidate, sell or distribute the building. Eisenberg gifted shares of the corporation to her son and grandchildren. In valuing the stock for gift tax purposes, she reduced the market value of the stock by the amount of capital gains tax the corporation would eventually owe if it liquidated, sold or distributed the building. The tax court disallowed the discount on grounds that the future tax on the corporation was speculative, and could be avoided in any event by appropriate tax planning. The Second Circuit reversed, based on changes to the tax code in 1986 by which future taxation became a virtual certainty—unless, that is, the

corporation were to convert to a Subchapter S corporation and hold the property for 10 years, by which means it could, indeed, avoid recognizing the gain—and there was no evidence in the case that Eisenberg intended to convert to a Subchapter S corporation.[6]

*Eisenberg* is unhelpful for other reasons, as well. Appraisal techniques that are valid in some contexts, such as valuation for gift tax purposes, may not be valid in the context of dissenters' rights appraisals. *See* 2 PRINCIPLES OF CORPORATE GOVERNANCE, *supra*, § 7.22 (valuation principles adopted by section 7.22 are those that are appropriate for appraisal in dissenters' rights cases; they do not necessarily apply in other contexts, such as valuation of stock for tax or ERISA purposes). We deal here with stock that is to be purchased by the corporation from shareholders, not stock that is to be gifted to third parties.

More to the point are the few cases that have dealt with the issue at hand. In *Hansen v. 75 Ranch Co.*, 1998 MT 77, ¶¶ 47-48, 288 Mont. 310, 957 P.2d 32, the court disallowed a discount for built-in gains in a dissenters' rights case, reasoning that value was to be determined based on the corporation as a going concern, not based on a liquidation that was not contemplated.

In *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 554-55 (Del. 2000) the court rejected the argument that a discount for built-in gains, as well as for costs of sale that would be incurred upon liquidation of the corporate assets, was fair because the dissenting shareholders would receive precisely the same value by this means of appraisal as they would if the corporation had sold all its assets and paid the resulting capital gains taxes and costs of sale. The court reasoned that the dissenting shareholders were entitled to the fair value of their proportionate value of a going concern on the date of merger, rather than the value that is determined on a liquidation basis. But the court also said

---

[6] We note the irony. Matthew G. Norton Company has not remarked upon the fact that it became a Subchapter S corporation as a result of the very reorganization that gave rise to the dissenters' rights in this case.

that, at the corporate level, though not at the shareholder level, the trial court has the authority to consider such discounts as might be appropriate in light of the exact nature of the enterprise being examined. *Id.* at 556 ("In *Tri-Continental*, this Court held that the Court of Chancery had the authority to discount asset values at the corporate level, in appropriate circumstances, as a means of establishing the fair value of the entire corporation as a going concern. Read in the proper context, *Tri-Continental* was an acknowledgment that the Court of Chancery was vested with the authority to make a discount of the subject corporation's fair asset value at the corporate level because it constituted a proper application of an accepted methodology for arriving at the proper valuation of the unique corporate enterprise . . . .").

■ Reading *Paskill* as a whole, we believe that it means that while discounts for built-in capital gains are not generally appropriate in dissenters' rights appraisal cases where no liquidation of the corporation is contemplated, such discounts might be appropriate, at the corporate level, if the business of the company is such that appreciated property is scheduled to be sold in the foreseeable future, in the normal course of business.

This construction of *Paskill* comports with the reasoning of the courts in other cases. In *In re Shares of Common Stock of Trapp Family Lodge, Inc.*, 169 Vt. 82, 725 A.2d 927, 934 (1999), the court rejected the contention of Trapp Family Lodge, Inc., that the trial court had erred by refusing to consider the tax consequences of a hypothetical potential sale of the resort. The court noted that "courts have generally rejected any tax discount 'unless the corporation is undergoing an actual liquidation.'" (quoting *Hansen*, 1998 MT 77, at ¶ 47). *See also Bogosian v. Woloohojian*, 158 F.3d 1, 6 (1st Cir. 1998) (trial court erred in failing to allow discount for built-in capital gains on a specific piece of corporate property that had to be sold in order to fund buyout of shares of dissenting shareholder, there being no other way to fund the purchase but such

sale, and tax consequences therefore inevitable); *cf.*, *In re Marriage of Hay*, 80 Wn. App. 202, 205, 907 P.2d 334 (1995) (in context of a corporate valuation in a marital dissolution proceeding, if tax consequences are imminent, or arise directly from the trial court's property disposition, and are not speculative in amount, they may be considered).

As was true of the trial court's ruling with respect to lack of marketability, the trial court's bright-line ruling with respect to the tax discount issue is too broad, or at least it was premature in this case in light of the present state of the discovery. We agree with the trial court that a wholesale discount for built-in capital gains on all the appreciated assets of the companies based on hypothetical liquidation at some indefinite time in the future is not appropriate. To the extent that the ruling was intended for that proposition, we affirm.

█ But, as noted by the appraiser hired by the dissenting shareholders, discovery had not progressed to the point that he could look at data relating to the historical pattern of disposition of assets, and any plans relating to holding periods of appreciated and depreciated assets that could be relevant to valuation of the companies as of the date of merger. RCW 23B.13.010(3) excludes consideration of appreciation or depreciation in anticipation of the corporate action that gave rise to the dissent (unless exclusion would be inequitable). But as evidenced by the citation to *Weinberger* contained in the Official Comments to the statute, this does not mean that every fact of consequence that occurs after the date of merger is thereby rendered irrelevant. The *Weinberger* court said that, in determining what figure represents the true or intrinsic value of dissenters' stock that has been taken by the merger, all " 'facts [that] were known or which could be ascertained as of the date of merger and which throw any light on *future prospects* of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but *must be considered* by the [court].' " *Weinberger*, 457 A.2d at 713 (quoting *Tri-Continental*, 74 A.2d at

72). By that same token, we believe that facts that were known or could be ascertained as of the date of the merger that relate to disposition of a particular appreciated asset— such as contemplation of sale of the asset in accord with preexisting planning in the normal course of business—are properly considered in determining net asset value in a dissenting shareholders case, provided, however, that the shareholder will not effectively be paying his or her proportionate share of the tax on this same appreciation, upon taxation of the proceeds of sale of his or her appreciated stock back to the corporation. To the extent that the trial court's ruling was intended to preclude any such considerations, we reverse.

We emphasize that to the extent that MGN wishes the trial court to consider such tax implications, it needs to provide the trial court with a reasonable explanation of why such built-in gains should be considered in light of the fact that it has converted to Subchapter S status thereby avoiding the double taxation problems of "C" corporations, and it needs to show the court by substantial evidence and appropriate briefing that the dissenting shareholders will not already have been taxed for their fair share of the gain on any such appreciated assets by virtue of the corporation's redemption of their appreciated shares for "fair value."

Reversed in part, affirmed in part, and remanded to the trial court for a determination of "fair value" in light of this opinion and such additional evidence as completion of discovery may reveal.

ELLINGTON and APPELWICK, JJ., concur.